LINDA ROSS, PLAINTIFF–RESPONDENT, v. TRANSPORT OF NEW JERSEY, A CORPORATION OR BUSINESS ORGANIZATION, DEFENDANT–APPELLANT, AND MICHAEL GUIDO, JR., ALCIDES PEREZ AND RONALD LONGSON, JR., DEFENDANTS.

Argued September 27, 1988—Decided February 1, 1989.

*Madeleine W. Mansier,* Deputy Attorney General, argued the cause for appellant (*Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Kenneth E. Walker, II,* argued the cause for respondent (*Freeman & Bass,* attorneys).

*Alexander P. Waugh, Jr.*, argued the cause for *amici curiae* New Jersey Manufacturers Insurance Company and National Association of Independent Insurers (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

The opinion of the Court was delivered by

HANDLER, Justice.

The broad issue presented by this appeal implicates any obligations of the defendant New Jersey Transit Bus Operations, Inc.,[1] a public entity, to provide insurance for claims attributable to injuries from vehicular accidents involving the buses that it owns and operates. The issue is raised by the plaintiff, Linda Ross, who was a passenger on a Transit bus when it was struck by a stolen vehicle. Ross filed suit to recover personal injury damages against Ronald Longson, Jr., the driver of the stolen vehicle; Transit; Transit's bus driver, Michael Guido, Jr.; and the owner of the stolen car, Aleides Perez.

The matter was submitted to arbitration pursuant to *N.J.S.A.* 39:6A–25 to –35. The arbitrator found Longson to be the sole party at fault and awarded damages of $1,555 for medical bills and $4,000 for pain and suffering. Ross moved for an order to confirm the arbitration award and compel payment. In addition, she requested that Transit be compelled to pay these damages through uninsured motorist coverage because Longson was uninsured and the stolen car involved in the accident was not covered by the owner's insurance policy. She argued that Transit, like every operator of a motor vehicle, should carry this basic coverage for the benefit of passengers in the vehicle. The trial court entered judgment against Longson but

---

[1]This defendant (hereafter "Transit") was improperly impleaded as Transport of New Jersey, a private bus company which was purchased by Transit, a public entity, on October 15, 1980, pursuant to the Public Transportation Act of 1979, *N.J.S.A.* 27:25–1 to –24. The accident for which suit was brought occurred on April 4, 1984.

denied the motion to compel Transit to pay. Ross then appealed this denial.

In a unanimous decision the Appellate Division reversed the trial court determination. *Ross v. Transport of New Jersey*, 218 *N.J.Super.* 326 (1987). Transit then filed a petition for certification, which was granted. 109 *N.J.* 46 (1987).

## I.

The initial question is whether Transit, as a public entity, is subject to the provisions of the Motor Vehicle Security–Responsibility Law, *N.J.S.A.* 39:6–23 to –60 (hereafter "Responsibility Law"), which would obligate it to carry uninsured motor vehicle insurance coverage. Uninsured motor vehicle insurance covers the risk that a passenger in a vehicle may be injured through the negligence of the operator of another vehicle that is not insured. Transit argues that it is exempt from uninsured motorist coverage by virtue of *N.J.S.A.* 39:6–54. *N.J.S.A.* 39:6–54 specifies that the Responsibility Law "shall not apply with respect to any motor vehicle owned by ... this State or any political subdivision of this State...."

This question presents a matter of statutory construction. Its determination entails an examination of the State's comprehensive statutory system, which is designed to have "financially responsible persons available to meet the claims of persons wrongfully injured in automobile accidents." *Selected Risks Ins. Co. v. Zullo*, 48 *N.J.* 362, 371 (1966).

Central to this statutory scheme is *N.J.S.A.* 39:6B–1 to –3 ("Compulsory Insurance Law"). Under this Law, owners of motor vehicles registered or principally garaged in the state must maintain motor vehicle liability insurance coverage for at least the minimum amount statutorily established. The law provides penalties when this is not done. The New Jersey Automobile Reparation Reform Act ("No Fault Act"), *N.J.S.A.* 39:6A–1 to –20, further mandates that every liability policy insuring automobiles shall include "no fault" coverage, provid-

ing compensation without regard to fault for automobile accidents involving members of the insured's family and injuries to passengers or pedestrians resulting from accidents involving the insured's car. *See Sotomayor v. Vasquez,* 109 *N.J.* 258, 261 (1988); *Zyck v. Hartford Ins. Group,* 143 *N.J.Super.* 580 (Law Div.1976), aff'd 150 *N.J.Super.* 431 (App.Div.1977), certif. den. 75 *N.J.* 521 (1977). The No Fault Act also requires that automobile policies maintain uninsured motorist ("UM") coverage as provided under *N.J.S.A.* 17:28–1.1.[2] *See N.J.S.A.* 39:6A–14. To satisfy the UM provision, no policy insuring motor vehicles of any type can be issued without providing minimal protection against damages due to accidents involving uninsured vehicles or "hit and run" vehicles.[3] Significantly, however, this Act does not apply to policies insuring buses, *see Wagner v. Transamerica Ins. Co.,* 167 *N.J.Super.* 25, 31 (App. Div.), certif. den. 81 *N.J.* 60 (1979).

The Responsibility Law, under which Transit claims to be exempt from insurance obligations, also mandates the form of insurance policies, *N.J.S.A.* 39:6–48. For those who do not have insurance or a certificate of self-insurance, this Law provides penalties such as the automatic suspension of license and registration (or of in-state driving privileges for foreign drivers). *N.J.S.A.* 39:6–25 to –27. It thus directly supports the

---

[2]*N.J.S.A.* 17:28–1.1 prescribes the form and content of automobile insurance policies and generally requires UM coverage when a liability policy is issued.

[3]Before the compulsory requirement was legislated in 1972, drivers could legally use uninsured automobiles. Unsurprisingly, this resulted in many more UM incidents. At that time, the Responsibility Law required the suspension of licenses of individuals violating certain vehicle related laws, *see N.J.S.A.* 39:6–31(a) to (f) (repealed) (listing laws), until they showed proof of "financial responsibility," *i.e.,* the ability to pay certain set amounts in cases of auto accidents. *See N.J.S.A.* 39:6–31 to –34, –40, –41, –43 to –46 (repealed). These requirements were eventually eliminated "because they [were] no longer necessary under the system of compulsory automobile insurance pursuant to the no-fault law and the compulsory insurance law." Senate Public Safety and Defense Committee, *Statement to L. 1979, c. 169.*

Compulsory Insurance Law, and indirectly supports the compulsory UM requirements of the No Fault Act and Title 17. *See also Williams v. Sills*, 55 *N.J.* 178, 181 (1970) ("principal design [of Responsibility Law] was to protect the public against financially irresponsible motorists"). In addition, *N.J.S.A.* 48:4–46 to –48 regulates buses and taxicabs as public utilities, and requires that private operating vehicles carrying passengers for hire maintain established insurance protection or self-insurance, *N.J.S.A.* 48:4–47. This then triggers the requirement in Title 17, *N.J.S.A.* 17:28–1.1, that all auto insurance coverage include UM protection.

Another relevant part of the comprehensive statutory scheme is the Unsatisfied Claim and Judgment Fund Law ("UCJF Law"), *N.J.S.A.* 39:6–61 to –91. This Law establishes a fund, supported by insurers, to provide damage relief for persons who sustain losses or injury inflicted by financially irresponsible or unidentified operators of motor vehicles when such persons would otherwise be remediless. *See Tiger v. American Legion Post No. 43*, 125 *N.J.Super.* 361, 371 (App.Div. 1973); *McKenna v. Wiskowski*, 181 *N.J.Super.* 482, 489 (Ch. Div.1981). The Compulsory Insurance Law was designed in part to relieve the UCJF of serious financial pressures since, in confluence with the requirement that all insurance policies maintain UM protection, the UCJF Law provides "exclusively remedial parallel coverage against the negligence of uninsured and unknown motorists to be provided by one's liability carrier." *Beltran v. Waddington*, 155 *N.J.Super.* 264, 268 (App. Div.1978); *see Lundy v. Aetna Casualty & Sur. Co.*, 92 *N.J.* 550, 554–55 (1983); *Motor Club of Amer. Ins. Co. v. Phillips*, 66 *N.J.* 277, 284–85 (1974); *see also* New Jersey Senate and Assembly Committees on Banking and Insurance, *Public Hearing on Assembly Bill No. 111 and Senate Bill No. 481*, at 10 (March 4, 1968) (statement by Salvatore Capozzi, Manager of the UCJF Board, noting need to alleviate financial troubles of

UCJF).[4]

It is significant that there are a number of exemptions for public agencies in this comprehensive statutory scheme. As noted earlier, *N.J.S.A.* 39:6–54 exempts any government owned motor vehicle from the Responsibility Law. In addition, the New Jersey Public Transportation Act of 1979, *N.J.S.A.* 27:25–1 to –24, specifically exempts Transit, as a public bus company, from provisions of Title 48, including the requirement that bus companies maintain insurance or self-insurance. *N.J.S.A.* 27:25–8. *See Transport of New Jersey v. Matos,* 202 *N.J.Super.* 571, 576–77 (Law Div.1985). Nevertheless, the Compulsory Insurance Law does not specifically state that the exemption of *N.J.S.A.* 39:6–54 applies to it, even though this Law was enacted pursuant to a statute that was "supplementing Title 39 ...," *L.* 1972, *c.* 197. Casting additional doubt on the applicability of the exemption is the statutory authority for a public transit utility to insure itself or establish a self-insurance fund. *N.J.S.A.* 27:25–5(r).[5]

---

[4]Indeed, this strong policy favoring the protection of the UCJF importunes the judiciary to be guardian for the monies held in trust for its stated purpose and that the fund "be administered in a fashion to assure that only those persons legitimately entitled to participate in its benefits are paid therefrom. This is a duty ... owed to the contributors [*i.e.,* insurance companies] as well as the general public." *Douglas v. Harris,* 35 *N.J.* 270, 279 (1961); *see Brown v. Shaw,* 174 *N.J.Super.* 32, 40 (App.Div.1980).

[5]Under *N.J.S.A.* 27:25–5(r) Transit is allowed to:

Procure and enter into contracts for any type of insurance and indemnify against loss or damage to property from any cause, including loss of use and occupancy, against death or injury to any person, against employees' liability, against any act of another member, officer, employee or servant of the corporation, whether part-time, full-time, compensated or noncompensated, in the performance of the duties of his office or employment or any other insurable risk. In addition, the corporation may carry its own liability insurance.

In *Matos, supra,* 202 *N.J.Super.* at 576 it was noted that this provision "[a]t best ... enables [Transport] to provide for its insurance needs on a discretionary basis."

The critical question then is whether the Responsibility Law's exemption, *N.J.S.A.* 39:6–54, is applicable to the Compulsory Insurance Law. If the exemption is inapplicable, then Transit is required both to insure and have UM coverage by virtue of Title 17. If, on the other hand, it is exempt, there will be no UM requirement because Title 17 requires UM coverage be provided only as an included provision of an existing insurance policy or as a constituent part of any obligation to provide self-insurance. As noted, the Appellate Division ruled that the exemption of *N.J.S.A.* 39:6–54 did not apply to Transit, exposing it to the statutory obligations of providing insurance, including uninsured motorist coverage. 218 *N.J.Super.* at 330. We disagree.

 There is no dispute that the obligation to provide insurance, and the concomitant obligation to provide UM coverage, is not limited to insurance obtained through authorized insurance carriers. The statutory scheme encompassed by the compulsory insurance and UM laws "express[es] the legislative intent that all New Jersey motor vehicles, covered by commercial insurance or self-insured, must be insured against injury or damage caused by uninsured motorists." *Transport of New Jersey· v. Watler,* 161 *N.J.Super.* 453, 457 (1978), aff'd as modified, 79 *N.J.* 400 (1979). Thus, a private company's certificate of self-insurance is said to constitute an insurance "policy," which subjects it to Title 17 UM requirements. 79 *N.J.* at 401; *see Mortimer v. Peterkin,* 170 *N.J.Super.* 598, 599–600 (App.Div.1979) (self-insured liable for injuries to passenger caused solely by negligence of uninsured motorist); *Crocker v. Transport of New Jersey,* 169 *N.J.Super.* 498, 501 (Law Div. 1979) (no distinction between type and extent of coverage found in insurance policy or self-insurance fund and therefore self-insured must provide UM coverage for passenger hurt due to fault of uninsured motorist who collided with private bus).

 The Appellate Division concluded that the government vehicle exemption of the Responsibility Law does not provide an

exemption from required self-insurance but merely "allow[s] Transit to operate its buses without obtaining liability insurance," *Ross, supra,* 218 *N.J.Super.* at 330. It does not follow, however, that a public entity that is not obliged to provide insurance issued through insurance carriers automatically falls into the category of a self-insured with the corollary obligation to provide UM coverage. Whether such a public entity is self-insured and obligated to provide UM protection requires a further assessment of legislative intent and public policy.

The underlying premise of the Appellate Division's interpretation of the exemption under the Responsibility Law that would impose responsibility for UM protection on Transit is that a public agency has two statutory options: to obtain insurance or to provide self-insurance. It is not likely, however, that this particular provision of the Responsibility Law was intended to allow public agencies this kind of option. Such a statutory option is provided elsewhere, *i.e., N.J.S.A.* 39:6–52, and its inclusion in the Responsibility Law would be unnecessary. A statutory construction of *N.J.S.A.* 39:6–54 to provide an express option of self-insurance would be meaningless because self-insurance is already available as a substitute for the purchase of insurance.

Moreover, legislative intent and public policy require that one read the Compulsory Insurance Law in *pari materia* with the Responsibility Law. To do otherwise would rob the Responsibility Law of much of its value and lead to results surely not intended by the Legislature. For example, since the Compulsory Insurance Law provides no separate exemption for self-insurance, reading it as a totally independent enactment would seemingly make self-insurance a violation of its provisions because the self-insurance exemption of the Responsibility Law, *N.J.S.A.* 39:6–52, would not be applicable. It seems both illogical and unreasonable to conclude that the self-insurance exemption is applicable without also finding the government exemp-

tion to be applicable.[6]

The legislative history of these related statutes reinforces the conclusion that the government exemption is applicable. The Responsibility Law, including *N.J.S.A.* 39:6–54, was enacted in 1952. In 1972, the Legislature supplemented Chapter 6 with Chapter 6A, the No Fault Act, and Chapter 6B, the Compulsory Insurance Law. Chapter 6B was enacted as a *supplement* to Title 39 and so did not affect any of the existing provisions of Chapter 6.[7] Then, in 1979, the Legislature amended and repealed portions of the Responsibility Law. The repealed sections were *N.J.S.A.* 39:6–31, 32, 33, 34, 40, 41, 43, 45, 46, and 47 involving proof of financial responsibility. The purpose of the repealer law was "to eliminate those requirements because they are no longer necessary under the system of compulsory automobile insurance pursuant to the no-fault law and the compulsory insurance law. *See N.J.S.A.* §§ 39:6A–1 *et seq.* and 39:6B–1 *et seq.*" Statement of the Senate Law, Public Safety and Defense Committee, No. 488, *L.* 1979, *c.* 169. Significantly, the Legislature did not repeal or amend *N.J.S.A.* 39:6–54 in either 1972 or 1979, although it easily could have done so. Thus, the Legislature's decision not to alter *N.J.S.A.* 39:6–54 confirms this Court's determination that the Legislature intend-

---

[6] If the Compulsory Insurance Law and Responsibility Law are read *in pari materia,* then a recent amendment to the latter's government-exemption clause may affect future interpretations of these provisions. *See L.* 1987, *c.* 428, § 3. Transit argues that this new provision gives public entities the right to self-insure despite their exemption from insurance requirements—a right not needed if defendant was already obligated to purchase insurance or self-insure. According to *amici curiae,* New Jersey Manufacturers Insurance Company and National Association of Independent Insurers, this new amendment supports its conclusion that the Compulsory Insurance Law (*i.e., N.J.S.A.* 39:6B–1 to 6B–3) applies to government vehicles. Transit, however, is not affected in this case by either possible interpretation since the amendment occurred after the events at issue.

[7] The title of the act set forth at *N.J.S.A.* 39:6B–1 to –3 is "An Act providing for compulsory motor vehicle insurance coverage and supplementing Title 39 of the Revised Statute." *L.* 1972, *c.* 197.

ed the government exemption from the Responsibility Law to apply to the Compulsory Insurance Law.

## II.

■ UM requirements do not apply to defendant only to the extent that it is not insured. If Transit did decide to insure, then it would be forced by Title 17 to purchase UM coverage along with any other vehicle insurance. Similar reasoning applies to self-insurance since the status of a self-insured is considered the equivalent of insurance, thus requiring the provision of UM coverage. See discussion, *supra* at 139; *Watler, supra,* 161 *N.J.Super.* 453. The narrow question remaining, therefore, is whether Transit may be said to have the status of a self-insured since it has not purchased any insurance.

The Appellate Division held that *Christy v. City of Newark,* 102 *N.J.* 598 (1986), constituted authority for its conclusion that public entities such as Transit occupied the status of a self-insured and remained obligated to provide uninsured motorist coverage. *Ross, supra,* 218 *N.J.Super.* at 330. The Appellate Division interpreted *Christy* to require UM protection not only where a government entity actually had an established self-insurance fund, but also when it was merely authorized to create such a fund, even if it had not chosen to do so. 218 *N.J.Super.* at 330. Although acknowledging that Transit was *permitted* but not *required* to self-insure, *id.* at 330 n. 5, the Appellate Division found that *Christy* provided a sufficient basis for finding Transit to be required to furnish UM coverage. Thus, *Christy,* according to the Appellate Division, effectively overruled the contrary earlier decision in *Matos, supra,* 202 *N.J.Super.* 571, by assuming that an entity was, in effect, "self-insured" whenever it did not purchase insurance, 218 *N.J.Super.* at 329 n. 4. Under this reasoning, the absence of any actual insurance fund would not be a condition to being self-insured.

There is a difference between being self-insured and uninsured. The case relied on by the Appellate Division in reaching

the contrary conclusion, *American Nurses Ass'n. v. Passaic Gen. Hosp.*, 192 *N.J.Super.* 486 (App.Div.), affirmed in part and reversed in part 98 *N.J.* 83 (1984), does not support the lower court's analysis. The court in that case did note that "[t]he essence of self-insurance ... is the retention of risk of loss by the one upon whom it is directly imposed by law or contract." 192 *N.J.Super.* at 491. However, the case referred to "self-insurance" solely to differentiate between the source of insurance. This was done in the context of finding that a hospital's contractual obligation to indemnify employees for the first $100,000 of any malpractice claim, *i.e.*, the "self-insurance" component of coverage, did not constitute "other insurance" under a policy of insurance held by employees providing non-responsibility for amounts covered by "other insurance." The context was thus totally different from this case where the term "self-insured" is meant to be used as a form of protection equivalent to a policy of insurance. In fact, the *American Nurses* opinion included dicta that under New Jersey case law formal self-insurance funds are treated as being essentially the equivalent of insurance. *Id.* at 493. The court refused to express any opinion on the status of such funds, however, since no fund was at issue in the case.

*Christy* also cautions against too broad a reading of what constitutes self-insurance. The Court's reasoning was based on the fact that the City of Newark did have an established self-insurance fund. *Christy, supra,* 102 *N.J.* at 608. This fund was created under a totally separate law, *N.J.S.A.* 40A:10–6, which provides authority for establishing self-insurance funds to protect "against liability resulting from the use or operation of motor vehicles, equipment or apparatus ..." owned by a municipality. *See Christy, supra,* 102 *N.J.* at 601. The Court found that by using this statute to create an insurance fund, Newark had the status of an "insured," and thus fell under the "statutory contract" of Title 17 mandating UM protection whenever insurance is otherwise provided. *Id.* at 608. The court below thus misunderstood that *Christy* stated

that once insurance, in any form, was provided, this will trigger the statutory requirement of UM coverage under Title 17. Unlike Newark in *Christy*, Transit has not availed itself of the opportunity to self-insure.[8]

Whether a non-insuring public entity is to be treated as self-insured should also be considered in light of relevant public policy. If Transit is exempt under *N.J.S.A.* 39:6–54 from any insurance obligation as a government agency or instrumentality, then this is consistent with policy considerations that limit the potential liability of government agencies through some type of immunity. *See, e.g.,* The Torts Claims Act, *N.J.S.A.* 59:1–1 to 12–3.

As noted, the court below viewed *Christy* as indicating that the "statutory contract" language of Title 17 gave Newark the status of an insured and made the Tort Claims Act inapplicable. The Appellate Division found no merit in Transit's contention that *N.J.S.A.* 59:2–1(a) of the Tort Claims Act barred recovery against it for the acts of third parties. 218 *N.J.Super.* at 330. It based its determination on its understanding that *Christy* held that uninsured motorist claims were not claims in tort but arose out of a "statutory contract." *Ibid.; see Christy, supra,* 102 *N.J.* at 610.

The Appellate Division placed undue emphasis on the putative contractual basis of the UM claim. "A recovery under a UM policy is regarded 'as damages' by statute, *N.J.S.A.* 17:28–

---

[8]Defendant argues that since the *Christy* defendant relied on Title 40 in creating its self-insurance fund, this should not have any impact on the applicability of the exemption bar to the current case as that bar attaches only to self-insurance under Title 39. It refers to *Christy, supra,* 102 *N.J.* at 604, noting Appellate Division holding that the Responsibility Law's exemption bar did not attach to the insurance fund in *Christy* as this fund was created under a different law found in Title 40. This reasoning is incorrect, however, since if Transit did create a self-insurance fund, it would do so not under the Responsibility Law but through its authority to insure or self-insure, if it so desired, under *N.J.S.A.* 27:25–5(r). Thus the exemption found in Title 39 would be equally inapplicable, and the "statutory contract" of Title 17 would come into force mandating UM coverage once insurance was provided.

1.1, and its essence is as compensation for the insured driver's common law liability." *Montedoro v. Asbury Park,* 174 *N.J. Super.* 305, 308 (App.Div.1980); *see Satzinger v. Satzinger,* 156 *N.J.Super.* 215, 221–22 (Ch.Div.1978). In fact, the legal entitlement for recovery under UM provisions relies on "all of the normal rules governing tort liability and damages." *Montedoro, supra,* 174 *N.J.Super.* at 309; *see Midland Ins. Co. v. Colatrella,* 102 *N.J.* 612, 616–17 (1986). Thus, an uninsured motorist claim is a statutory cause of action which has many characteristics of a tort action.

On a policy level, there is considerable substance to the view that the liability of public entities ought to be circumscribed or limited as reflected by the Tort Claims Act. As such, Transit, as a public entity, *see Gibson–Homans Co. v. New Jersey Transit Corp.,* 560 *F.Supp.* 110, 112 (D.N.J.1982) (Transit held to be alter ego of State and therefore not a citizen for diversity purposes), is covered by the protections of the Tort Claims Act. *See Matos, supra,* 202 *N.J.Super.* at 574–75 (Transit is covered by Tort Claims Act as legislative history and statutes creating it inescapably show it to be a public entity). Therefore, this Court's conclusion that Transit is exempt from providing UM coverage, a statutory cause of action with many tort law characteristics, is consistent with Transit's tort protection under the Tort Claims Act.

In *Matos, supra,* the Law Division stated, "[i]t is beyond question that the New Jersey Tort Claims Act governs state liability in all tort claims." *Id.* at 575. Thus, government entities have liability only "for injuries proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." *N.J.S.A.* 59:2–2. The court in *Matos, supra,* in dealing with a case that factually mirrors this one, correctly pointed out that

[n]owhere in the Tort Claims Act does it provide that a public entity may be held liable for acts of another. An uninsured motorist is clearly "another

person" for whom the public entity may not be held liable. [202 *N.J.Super.* at 575.]

Hence, the denial of recovery for Ross against Transit in these circumstances is consistent with the Tort Claims Act policy of · protecting government entities from liability for damages when they are blameless.

The decision that Transit not be required to insure or be self-insured, however, implicates not only the policy of limiting liability of public entities but also the public policies expressive of the desire to compensate victims of uninsured motorists and of the need to protect the financial integrity of the UCJF. The public policy behind the Tort Claims Act and the *N.J.S.A.* 39:6–54 exemption is not inconsistent with the public policies favoring UM coverage and protection of the UCJF's financial integrity, given the statutory scheme involved in this case. The latter two public policies are so strong that they should be applied to all possible situations "in the absence of an unmistakable legislative declaration to the contrary." *Christy, supra,* 102 *N.J.* at 608. In this case, however, such an unmistakable declaration does exist in the *N.J.S.A.* 39:6–54 exemption clause. Therefore, this is a limited situation where the public policy for UM coverage is overriden by a statutory exception and the UCJF is called on potentially to satisfy any uncompensated damages.

There is nothing unjust about Ross not being able to recover from Transit since our state law provides an adequate safety net for individuals hurt in such cases through recourse to the UCJF. Therefore, even though the guilty party is uninsured and unable to pay and the State is not required to pay, the injured bus passenger still has a potential source of recovery in these circumstances. There is an obvious public benefit to protect the public treasury and instead require payment by the insurance companies who will contribute to UCJF to satisfy claims such as those of Linda Ross.

## III.

A fair reading of the statutory materials at issue provides an exemption under *N.J.S.A.* 39:6–54 for Transit, and other government entities, from being forced under the Motor Vehicle–Security Responsibility Law either to purchase insurance, establish self-insurance funds, or assume the legal status of self-insureds. As a consequence of this exemption, such public entities are not obligated to provide UM insurance coverage or protection. Any contrary interpretation of the relevant statutes that leads to the conclusion that the exemption was inapplicable would mean that every government entity would be obligated at public expense to insure their vehicles or to provide self-insurance with UM insurance coverage. Such a result should not be permitted without some clearer indication that the Legislature, in creating the Compulsory Insurance Law, intended to create an exception to the policy governing governmental limitations on liability reflected in such laws as the New Jersey Tort Claims Act.

The judgment below is reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.