64 A.3d 571

KEVIN ROBINSON, PLAINTIFF–APPELLANT, v. MICHAEL
ZORN, NEW JERSEY TRANSIT CORPORATION, AND AN-
GELO LIONELLI, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted March 18, 2013—Decided April 17, 2013.

Before Judges FASCIALE, MAVEN and CARROLL.

*Spear, Greenfield & Richman, P.C.,* attorneys for appellant (*Marc F. Greenfield* and *Jeremy M. Weitz,* on the brief).

*Jeffrey S. Chiesa,* Attorney General, attorney for respondents Michael Zorn and New Jersey Transit Corporation (*Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Rahat N. Babar,* Deputy Attorney General, on the brief).

Respondent Angelo Lionelli has not filed a brief.

The opinion of the court was delivered by

FASCIALE, J.A.D.

In this personal injury lawsuit, plaintiff appeals from an order denying his motion to amend his complaint to assert an uninsured motorist (UM) claim against defendant New Jersey Transit (NJT). Plaintiff, an out-of-state uninsured individual, seeks a ruling from us that would require NJT to provide UM coverage. Because that request is unauthorized under present statutory law and is more appropriately within the province of the Legislature, we decline to do so and affirm.

The judge denied the motion, relying on *Ross v. Transport of New Jersey,* 114 *N.J.* 132, 147, 553 *A.*2d 12 (1989). In *Ross,* the Court determined that the defendant Transport of New Jersey[1] was not obligated to comply with the Compulsory Insurance Law, *N.J.S.A.* 39:6B-1 to -3, which requires owners of motor vehicles registered or principally garaged in New Jersey to maintain motor

---

[1] This defendant was improperly pleaded; NJT had already purchased Transport of New Jersey by the time of the events at issue in *Ross. Id.* at 134 n. 1, 553 *A.*2d 12.

vehicle liability insurance coverage for at least the statutory minimum. *Id.* at 141–42, 553 *A.*2d 12. The Court applied *N.J.S.A.* 39:6–54, which established a public entity exemption from the Compulsory Insurance Law, and concluded that a public entity, which has not chosen to insure or self-insure, is freed from the obligation to provide UM coverage. *Ibid.*

The Legislature then performed two important tasks pertinent to our analysis. In 1987, the Legislature amended *N.J.S.A.* 39:6–54a. *L.* 1987, *c.* 428, § 3.[2] And, in 2003, the Legislature enacted an insurance reform package and established, as part of that effort, a special automobile insurance policy (SAIP), *N.J.S.A.* 39:6A–3.3.[3] A SAIP provides limited automobile insurance.

The central question here is whether the Legislature altered the holding in *Ross* by passing the 1987 amendment and creating the SAIP. We conclude the Legislature did not modify the holding in *Ross* to require that public entities provide UM insurance coverage to out-of-state uninsured residents like plaintiff. Although plaintiff seeks a ruling from us that would require NJT to provide UM insurance coverage, we hold that the wisdom of any such requirement, which would change the policy of limiting government liability exposure as expressed in the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3, should be left to the Legislature.

I.

Plaintiff, a resident of Pennsylvania, did not own or have access to a vehicle. In October 2008, he boarded an NJT bus in

---

[2] The parties in *Ross* were not affected by the 1987 amendment because the amendment occurred "after the events at issue." *Id.* at 141, 553 *A.*2d 12.

[3] *N.J.S.A.* 39:6A–3.3 "creat[ed a] 'special' policy allowing certain low income persons to satisfy the compulsory insurance requirement by purchasing a policy with zero liability coverage." *Repossession Specialists v. GEICO Ins. Co.*, 423 *N.J.Super.* 518, 525, 33 *A.*3d 1242 (App.Div.), *certif. denied*, 210 *N.J.* 217, 42 *A.*3d 889 (2012).

Philadelphia to travel to a doctor's appointment in New Jersey. While in New Jersey, plaintiff sustained injuries caused by an accident between the bus and a vehicle driven by defendant Angelo Lionelli.[4]

Plaintiff filed his complaint against Lionelli, the bus driver, and NJT. Plaintiff then learned that there was no insurance available to compensate him for his pain and suffering. Although Lionelli had obtained a SAIP providing coverage for personal injury protection and death benefits, that policy did not provide third-party liability insurance, pursuant to *N.J.S.A.* 39:6A–3.3c. Plaintiff was ineligible to receive compensation under the New Jersey Property–Liability Insurance Guaranty Association Act (PLIGA), *N.J.S.A.* 17:30A–1 to –20, because he resided in Pennsylvania. Also, plaintiff was unable to obtain benefits through the Pennsylvania Financial Responsibility Assigned Claims Plan (PFRACP) because the accident occurred in New Jersey, 75 *Pa.C.S.A.* § 1752. He did not have automobile insurance of his own or live with any relative who did.

In June 2011, plaintiff filed a motion to amend his complaint to add a UM claim against NJT. On July 28, 2011, the judge denied the motion,[5] tried the case on liability only, determined that Lionelli was solely responsible for the accident, and then dismissed the complaint against NJT and the bus driver. In February 2012, the judge conducted a proof hearing and entered judgment against Lionelli in the amount of $86,668.65. This appeal followed.

On appeal, plaintiff argues that the judge erred by denying his motion to amend the complaint to add a UM claim against NJT. He contends that (1) *Ross* is factually distinguishable and inapplicable due to the creation of the SAIP; (2) denying his motion violates public policy; and (3) barring him from UM coverage

---

[4] Lionelli defaulted and is not involved in this appeal.

[5] The judge denied reconsideration and plaintiff also appeals from that denial.

against NJT would violate the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution, *U.S. Const.* amend. XIV, § 1.[6]

*Rule* 4:9–1 governs motions to amend the pleadings. Our Supreme Court has construed this rule to "require[ ] that motions for leave to amend be granted liberally, even if the ultimate merits of the amendment are uncertain." *Prime Accounting Dep't v. Twp. of Carney's Point*, 212 *N.J.* 493, 511, 58 *A.*3d 690 (2013) (internal quotation marks omitted). The Court stated, however, that

> [o]ne exception to that rule arises when the amendment would be "futile," because "the amended claim will nonetheless fail and, hence, allowing the amendment would be a useless endeavor." *Notte v. Merchants Mut. Ins. Co.*, 185 *N.J.* 490, 501 [888 *A.*2d 464] (2006). " '[C]ourts are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law.... [T]here is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted.' " *Ibid.* (quoting *Interchange State Bank v. Rinaldi*, 303 *N.J.Super.* 239, 256–57 [696 *A.*2d 744] (App.Div.1997)).
>
> [*Ibid.* (alterations in original).]

We conclude that the proposed amendment to assert a UM claim against NJT under present law would be futile, and the judge, therefore, did not err by denying plaintiff's motion.

## II.

We begin by explaining the rationale of the holding in *Ross, supra,* 114 *N.J.* 132, 553 *A.*2d 12. In *Ross*, Justice Handler addressed whether the defendant was obligated to provide insurance for "claims attributable to injuries from vehicular accidents involving the buses that it owns and operates." *Id.* at 134, 553

---

[6] We have considered plaintiff's Fourteenth Amendment claim and conclude that it is without sufficient merit to warrant an opinion in a written decision. *R.* 2:11–3(e)(1)(E). The Fourteenth Amendment states in part that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." *U.S. Const.* amend. XIV, § 1. The unavailability of UM benefits in the context of this case does not offend the Fourteenth Amendment's protection of the right to travel. *See Saenz v. Roe*, 526 *U.S.* 489, 502–03, 119 *S.Ct.* 1518, 1525–26, 143 *L.Ed.*2d 689, 703–04 (1999) (explaining the history of the Privileges and Immunities Clause of the Fourteenth Amendment).

*A*.2d 12. He analyzed whether the defendant was subject to the provisions of the Motor Vehicle Security Responsibility Law (Responsibility Law), *N.J.S.A.* 39:6–23 to –60, which otherwise would have obligated the defendant to carry UM coverage. *Id.* at 135, 553 *A*.2d 12. In *Ross*, the defendant contended that it was exempt from providing UM coverage pursuant to *N.J.S.A.* 39:6–54a, which states in part that the Responsibility Law "shall not apply with respect to any motor vehicle owned by ... this [s]tate." *Ibid.* In discussing the public entity exemption, Justice Handler stated:

It is significant that there are a number of exemptions for public agencies in this comprehensive statutory scheme. As noted earlier, *N.J.S.A.* 39:6–54 exempts any government-owned motor vehicle from the Responsibility Law. In addition, the New Jersey Public Transportation Act of 1979, *N.J.S.A.* 27:25–1 to –24, specifically exempts [the defendant], as a public bus company, from provisions of Title 48, including the requirement that bus companies maintain insurance or self-insurance. *N.J.S.A.* 27:25–8.

[*Id.* at 138, 553 *A*.2d 12.]

In determining the applicability of *N.J.S.A.* 39:6–54, the Court referenced the New Jersey Automobile Reform Act (No Fault), *N.J.S.A.* 39:6A–1 to –35,[7] and the Compulsory Insurance Law, and noted that although the Legislature repealed several sections of the Responsibility Law, it did not repeal *N.J.S.A.* 39:6–54. *Id.* at 141, 553 *A*.2d 12. Justice Handler then applied *N.J.S.A.* 39:6–54, and stated that

[t]he decision that [the defendant] not be required to insure or be self-insured, however, implicates not only the policy of limiting liability of public entities but also the public policies expressive of the desire to compensate victims of uninsured motorists and of the need to protect the financial integrity of the [Unsatisfied Claim and Judgment Fund (UCJF), *N.J.S.A.* 39:6–61 to –90]. The public policy behind the [TCA] and the *N.J.S.A.* 39:6–54 exemption is not inconsistent with the public policies favoring UM coverage and protection of the UCJF's financial integrity, given the statutory scheme involved in this case. The latter two public policies are so strong that they should be applied to all possible situations "in the absence of an unmistakable legislative declaration to the contrary." *Christy* [*v. City of Newark*, 102 *N.J.* 598, 608, 510 *A*.2d 22 (1986), *superseded by statute on other grounds*, *N.J.S.A.* 17:28–1.1c]. In this case, however, such an unmistakable

---

[7] The No–Fault Act mandates that every liability policy insuring automobiles in New Jersey shall include "no fault" coverage, *N.J.S.A.* 39:6A–4, and UM coverage, *N.J.S.A.* 39:6A–14.

> declaration does exist in the *N.J.S.A.* 39:6–54 exemption clause. Therefore, this is a limited situation where the public policy for UM coverage is overridden by a statutory exception....
>
> [*Id.* at 146, 553 *A.*2d 12.]

Justice Handler stated that if public entities were obligated at public expense to provide UM insurance coverage, then such a result "should not be permitted without some clearer indication that the Legislature ... intended to create an exception to the policy governing government limitations on liability as reflected in such laws as the [TCA]." *Id.* at 147, 553 *A.*2d 12.

### III.

Although not expressly argued by plaintiff, for the sake of completeness, we now address whether the 1987 amendment to *N.J.S.A.* 39:6–54a altered the holding in *Ross*. We do this for two reasons. The Court in *Ross, supra,* 114 *N.J.* at 141 n. 6, 553 *A.*2d 12 indicated, without resolving the issue, that the 1987 amendment *"may* affect future interpretations of [the comprehensive statutory scheme]." (Emphasis added). And, one leading treatise has stated that "the 1987 amendment of *N.J.S.[A.]* 39:6–54a would *apparently* make public entities liable for insurance mandated under *N.J.S.[A.]* 39:6A and 39:6B obviating the arguments made in *Ross*." Craig & Pomeroy, *New Jersey Auto Insurance Law,* 544 (2013) (emphasis added).

On September 14, 1987, the Legislature introduced Assembly Bill A.4547, which sought to amend *N.J.S.A.* 39:6–54a. *L.* 1987, *c.* 428. The bill provided the following:

> This act shall not apply with respect to any motor vehicle owned by the United States, this [s]tate[,] or any political subdivision of this [s]tate or any municipality therein; nor with respect to any motor vehicle which is subject to the requirements of law requiring insurance or other security on certain types of vehicles, <u>other than the requirements of *P.L.*1972, *c.* 70 ( [*N.J.S.A.*] 39:6A–1 et seq.) or *P.L.*1972, *c.* 197 ( [*N.J.S.A.*] 39:6B–1 et seq.).</u>
>
> [ (Emphasis added).]

The amendment added the underlined portion. *L.* 1987, *c.* 428, § 3. We conclude that this amendment does not alter the holding in *Ross*. Rather, the amendment preserves the exemption for

publicly-owned vehicles from New Jersey's No–Fault insurance scheme or the Compulsory Insurance Law.

When interpreting a statute, the terms used must be given their ordinary and accepted meaning guided by the goal of effectuating the Legislature's purpose in enacting the statute. *State v. Shelley*, 205 *N.J.* 320, 323, 15 *A.*3d 818 (2011). Here, the Legislature used a semicolon to separate two classes of motor vehicles in *N.J.S.A.* 39:6–54a: those "owned by the United States, this [s]tate[,] or any political subdivision of this [s]tate or any municipality therein" and—following the semicolon—those "subject to the requirements of law requiring insurance or other security on certain types of vehicles." The use of a semicolon to separate clauses or subsections in a statute makes them disjunctive in nature. *State v. Smith*, 262 *N.J.Super.* 487, 506, 621 *A.*2d 493 (App.Div.), *certif. denied*, 134 *N.J.* 476, 634 *A.*2d 523 (1993); *see also Morella v. Grand Union/N.J. Self–Insurers Guar. Ass'n*, 391 *N.J.Super.* 231, 240–41, 917 *A.*2d 826 (App.Div.2007) (providing a general discussion of statutory construction regarding application of commas and semicolons), *aff'd o.b.*, 193 *N.J.* 350, 939 *A.*2d 226 (2008).

The use of the semicolon indicates an intention on the part of the Legislature to separate the first group of vehicles, those owned by federal, state, or municipal governments, from the modifying clause "other than the requirements of *P.L.* 1972, *c.* 70 ( [*N.J.S.A.*] 39:6A–1 et seq.) or *P.L.* 1972, *c.* 197 ( [*N.J.S.A.*] 39:6B–1 et seq.)." The amendment, therefore, limited the second exemption to those vehicles covered by insurance requirements other than the No–Fault insurance scheme and Compulsory Insurance Law and clarified that the exemption provided for vehicles otherwise required to carry insurance.

Our conclusion that the 1987 amendment did not alter *Ross* is consistent with both the Legislature's decision to limit public entity liability pursuant to the TCA, *see Ross, supra*, 114 *N.J.* at 146, 553 *A.*2d 12, and with our continued reliance on *Ross* to support the proposition that a public entity which has not chosen

to procure insurance or provide self-insurance is exempt from providing UM coverage. *See N.J. Mfrs. Ins. Co. v. Hardy,* 178 *N.J.* 327, 336, 840 *A.*2d 231 (2004) (relying on *Ross* for the proposition that the exemption "excepts governmental entities from the regulatory requirements for 'self-insurance' status, allowing such entities to 'go bare' "); *Prudential Prop. & Cas. Ins. Co. v. Monmouth Cnty. Mun. Joint Ins. Fund,* 141 *N.J.* 235, 242–43, 661 *A.*2d 785 (1995) (noting that NJT's exemption in *Ross* was consistent with the TCA); *Downey v. City of Elizabeth,* 273 *N.J.Super.* 335, 338 n. 1, 641 *A.*2d 1109 (App.Div.1994) (acknowledging that in *Ross,* the Court concluded that NJT had "no compulsory insurance obligations at all").

## IV.

We now turn to plaintiff's contention that *Ross* is inapplicable. He contends that *Ross* does not apply for two reasons: it is factually distinguishable, and the Court in *Ross* did not anticipate that third-party insurance might be unavailable to an uninsured out-of-state individual involved in an accident with a person insured by a SAIP policy.

Plaintiff argues that *Ross* is factually distinguishable because here, unlike in *Ross,* he does not have recourse to PLIGA.[8] The Court in *Ross, supra,* 114 *N.J.* at 147, 553 *A.*2d 12, however, did not explicitly make its holding dependent on recourse to other insurance. Rather, the Court interpreted the comprehensive insurance statutory scheme and held that as a consequence of *N.J.S.A.* 39:6–54, "public entities are not obligated to provide UM insurance coverage." *Ibid.* If public entities were obligated at public expense to provide UM insurance to uninsured out-of-state individuals like plaintiff, then, as Justice Handler indicated, such a result "should not be permitted without some clearer indication

---

[8] The plaintiff in *Ross,* as a New Jersey resident and a passenger on an NJT bus, had a potential source of recovery through the UCJF. *Ross, supra,* 114 *N.J.* at 146, 553 *A.2d* 12.

that the Legislature ... intended to create an exception to the policy governing government limitations on liability as reflected in such laws as the [TCA]." *See ibid.*

We also reject plaintiff's contention that the SAIP, authorized by *N.J.S.A.* 39:6A–3.3, renders *Ross* nugatory. In 2002, Governor James McGreevey signed into law an insurance reform package. Governor McGreevey explained that the reform was "designed to simplify the regulatory process and provide incentives for insurers to do business in the state." *Press Release, Office of the Governor, State of N.J., McGreevey Signs Groundbreaking Auto Insurance Program* (June 9, 2003). The legislative history leading to the reform demonstrates the Legislature's desire to change the insurance scheme to improve market conditions, not to alter the exception afforded to public entities by *N.J.S.A.* 39:6–54.

On June 28, 2002, the Assembly introduced Assembly Bill A.2625, entitled the "New Jersey Automobile Insurance Competition and Choice Act." According to the Assembly Sponsor's Statement to A.2625 on June 28, 2002, the Legislature found and declared in pertinent part that

a. The existence of a vibrant, competitive private passenger automobile insurance market in New Jersey is clearly in the best interests of the [s]tate;

....

e. Many of these legislative controls have outlived their utility and the cumulative effect of their continuation is a regulatory system that stifles competition and has resulted in fewer and fewer automobile insurers doing business in the [s]tate;

....

h. The best interests of consumers will be served by encouraging existing insurers to remain in New Jersey and new insurers to do business in the [s]tate;

i. The Legislature has determined that a modernized regulatory system that promotes robust competition among insurers will better serve the needs and interests of consumers;

j. This Legislature finds and declares that a competitive marketplace is the most effective and efficient regulator of insurance for consumers and that an informed and willing buyer purchasing a product from a capable and willing seller is the optimal economic model for the insurance marketplace;

The promotion of a competitive marketplace should not diminish the ability of the [s]tate to protect policyholders and the public generally from unfair insurance practices and it is therefore essential that the [s]tate retain the necessary regulato-

ry authority to protect consumers and insure that the competitive market fairly and adequately serves consumers.

[*Assembly Sponsor's Statement to A.2625* at 2–3 (June 28, 2002).]

The Legislature did not make any declarations regarding the public entity exemption or how to treat out-of-state uninsured individuals who are involved in accidents with drivers and owners insured under a SAIP.

On March 17, 2003, the Senate issued its statement to S.63 (a substitute for A.2625), which stated in pertinent part:

The bill eliminates the [UCJF] Board and transfers all of its functions, powers[,] and duties, along with the [UCJF], to [PLIGA].

. . . .

In the interest of availability, the bill creates a new policy option with very limited benefits that will only be available to low income drivers who qualify for the federal Medicaid program. The policy will be priced by the commissioner and will include medical expense benefits for emergency and catastrophic care only, and a $10,000 death benefit. Covered persons will be precluded from having liability or physical damage coverage and will be subject to the verbal threshold. Vehicles covered by a special policy will be considered uninsured for purposes of uninsured motorist coverage under other policies. The technical amendments necessary to accommodate the new special policy are included in the bill as well.

[*Senate Commerce Committee, Statement to S.63* at 1, 3–4 (March 17, 2003).]

The Legislature approved *L.* 2003, *c.* 89 on June 9, 2003, which constitutes the "Senate Committee Substitute for Senate No. 63." *L.* 2003, *c.* 89. The Legislature found and declared:

a. The [UCJF], created pursuant to *P.L.* 1952, *c.* 174 ( [*N.J.S.A.*] 39:6–61 et seq.) currently serves a dual purpose: its original intent to pay the claims of victims of hit and run or uninsured motor vehicle accidents in certain circumstances, and a subsequent objective to reimburse private passenger automobile insurers when medical expense benefits payments exceed $75,000 per person per accident.

. . . .

c. Since all motor vehicle liability policies issued in this [s]tate, except basic automobile insurance policies, include coverage for the payment of all or part of the sums which a person insured thereunder shall be legally entitled to recover as compensatory damages from owners or operators of uninsured motor vehicles (other than hit and run motor vehicles), the number of third party claims made against the [UCJF] is not substantial. It would be more efficient to have these claims administered by the [PLIGA], established pursuant to *P.L.* 1974, *c.* 17 ( [*N.J.S.A.*] 17:30A–1 et seq.).

. . . .

f. It is in the public interest to authorize the transfer and consolidation of compatible operations of the [UCJF], the New Jersey Automobile Full Insurance Underwriting Association, and the Market Transition Facility to the [PLIGA].

g. Following transfer to the [PLIGA] by the [UCJF] of all its management, administrative and claim functions, the [UCJF] shall continue to exist as a separate legal entity subject to the provisions of *P.L.* . . . (now before the Legislature as this bill).

h. The [PLIGA] will run off the remaining policyholder claim obligations of the New Jersey Automobile Full Insurance Underwriting Association and Market Transition Facility. The [PLIGA] will also run off the obligations of the [UCJF] pursuant to section 2 of *P.L.* 1977, *c.* 310 ( [*N.J.S.A.*] 39:6–73.1) and take over all governance, administrative[,] and financial functions of the [UCJF], including the claim payment function.

[*Id.* at 1–5.]

As part of the overall insurance reform, the Legislature enacted *N.J.S.A.* 39:6A–3.3, creating the SAIP. The bill stated that

a. In order to assist certain low income individuals in this [s]tate and encourage their greater compliance in satisfying the mandatory private passenger automobile insurance requirements, the Legislature intends to establish a special automobile insurance policy. The special automobile insurance policy shall be offered only to individuals who qualify for and are actively covered by designated government subsidized programs in the [s]tate. For the purpose of this section, "eligible low income individual" means an individual who meets the income criteria established by the commissioner by regulation. In setting the low income criteria, the commissioner shall limit availability to those persons eligible and enrolled in the federal Medicaid program.

. . . .

c. A special automobile insurance policy shall not provide liability, collision, comprehensive, uninsured[,] or underinsured motorist coverage.[9]

[*Id.* at 49–51.]

Subsequently, the bill stated that an "uninsured motor vehicle" means "(d) an automobile covered by a special automobile insurance policy pursuant to . . . *P.L.* . . . (now before the Legislature as this bill)." *Id.* at 69–70. Thereafter, the bill noted that an "[u]ninsured motor vehicle" does not include "a motor vehicle which is owned by the United States . . . or a state." *Id.* at 70.

---

9 This is identical to the language currently used in *N.J.S.A.* 39:6A–3.3.

Therefore, the 2003 reform package and the creation of the SAIP did not alter the exception afforded to public entities by *N.J.S.A.* 39:6–54.

## V.

Finally, although the holding in *Ross* was not explicitly dependent on other insurance by which an injured person may seek recourse, we acknowledge that Ross had a "potential source of recovery" through recourse to the UCJF. *Ross, supra,* 114 *N.J.* at 146, 553 *A.*2d 12. Ordinarily, "[g]overnment ownership of a vehicle involved in an accident does not prevent a victim from pursuing No Fault or other compulsory insurance protections, including UM protection, from various sources." *Hardy, supra,* 178 *N.J.* at 337, 840 *A.*2d 231. Here, however, no such potential recovery existed for plaintiff.

Any interpretation of *N.J.S.A.* 39:6–54a leading to the conclusion that the exemption is inapplicable to uninsured out-of-state individuals like plaintiff, who have been involved in an accident with a person insured by a SAIP policy, would mean that public entities would be obligated at public expense to insure their vehicles or provide self-insurance with UM insurance coverage. As Justice Handler stated, "[s]uch a result should not be permitted without some clearer indication that the Legislature, in creating the Compulsory Insurance Law, intended to create an exception to the policy governing governmental limitations on liability reflected in such laws as the [TCA]." *Ross, supra,* 114 *N.J.* at 147, 553 *A.*2d 12; *cf. In re Closing of Jamesburg High Sch.,* 83 *N.J.* 540, 550, 416 *A.*2d 896 (1980) (holding that "important policy question[s]" should be left to the Legislature); *In re Veto by Governor Christie,* 429 *N.J.Super.* 277, 285–86, 58 *A.*3d 735 (App. Div.2012) (refusing to "interven[e]" where Legislature decided not to amend 2001 statute that is related to and arguably inconsistent with comprehensive 2011 legislation); *Brick v. Spivak,* 95 *N.J.Super.* 401, 406, 231 *A.*2d 380 (App.Div.) (stating that "even if [the court] were to assume that there was an inadvertent omission" in

the pertinent statute, the court "should not assume the function of the Legislature and rewrite the law to include therein something which those charged with the legislative responsibility might have inserted if the matter had been called to their attention"), *aff'd o.b.*, 49 *N.J.* 400, 230 *A.*2d 503 (1967). Following this well-settled precedent, we leave to the Legislature further consideration of whether NJT should be obligated to provide UM insurance coverage to uninsured out-of-state residents involved in New Jersey accidents with individuals insured by a SAIP. Under present law, we discern no basis for plaintiff to obtain judicial relief.

Affirmed.