821 A.2d 1148

ABDUSH SHAHID MUHAMMAD, PLAINTIFF–APPELLANT, v. NEW JERSEY TRANSIT, DEFENDANT AND THIRD PARTY PLAINTIFF–RESPONDENT, v. S & W CONTRACTING SER-VICES, INC., THIRD–PARTY DEFENDANT.

Argued December 3, 2002—Decided May 14, 2003.

186

*Mario A. Iavicoli* argued the cause for appellant.

*David B. Kosakoff* argued the cause for respondent (*L'Abbate, Balkan, Colavita & Contini,* attorneys; *Christopher B. Block,* on the brief).

The opinion of the Court was delivered by

ALBIN, J.

In this case, New Jersey Transit (NJT) hired S & W Contracting Services, Inc. (S & W) to remove asbestos from a roof and other portions of a garage that NJT owned and intended to demolish. It is uncontested that NJT advised S & W's president of the unstable and unsafe condition of the roof before his employees began working on the project. Plaintiff Abdush Shahid Muhammad, an S & W employee, suffered injuries when he fell through the roof while removing asbestos. Plaintiff claims that NJT did not discharge its landowner duty to him by the warnings given to his employer and that NJT should have warned him directly of the dangers of the defective condition of the roof. We hold that, as a public entity under the New Jersey Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 13–8, NJT did not act in a palpably

unreasonable manner by warning plaintiff's employer of the dangerous condition.

## I

This matter comes before the Court on an appeal from a grant of summary judgment dismissing plaintiff's cause of action. Given that procedural posture, we will consider only those material facts over which there is no dispute and view the evidence in the light most favorable to plaintiff. *R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

In 1995, NJT solicited price quotes from licensed asbestos abatement companies for the removal of asbestos contained in a garage it owned and intended to raze in Riverside, New Jersey. The specifications required the removal of asbestos from the building's boiler and pipe insulation, floor tile, and 31,500 square feet of roofing material. The contractors participating in the bidding process were told that the one chosen for the project would be responsible for the means and methods of the asbestos removal.

Russell Samaroo, NJT supervising engineer and project manager, and John Wasilak, NJT principal contract specialist, conducted a pre-bid conference with all potential contractors, including S & W. At that meeting, Samaroo and Wasilak advised the contractors of the project's specifications, the required safety procedures, the scope of the work, and the condition of the Riverside garage. The contractors were told that "the roof was ... in very poor condition." On the following day, Samaroo and a NJT environmental consultant led the potential contractors on a site inspection of the garage and again reviewed the project in detail. Samaroo warned the contractors that they "should use extra caution" as the garage was "an old building," "the roofing was not stable in all places," and there were "holes in the roofing." Stephen Henderson, founding member, majority shareholder, and president of S & W, was present at the site inspection and testified in a deposition that Samaroo "was very, very adamant about the

[damaged] condition of the roof" and stressed that the potential contractors should "look at the whole job as the roof being in bad condition." Henderson also testified that he "walked every square foot of the [garage] job" and that "all of the problems . . . with the roof" were made known to him.

S & W was selected for the project and entered into a contract with NJT on November 16, 1995. Before work began, representatives of S & W and NJT again discussed the poor condition of the site, particularly the roof. Henderson had overall responsibility for the project. He admitted observing a gaping hole approximately nine-by-fourteen feet in the "A" frame portion of the roof. According to Henderson, the workers discarded debris through the hole in the roof to a dumpster below. Henderson knew that "the whole roof was to be treated with extreme care." He also knew the age of the building and that it was scheduled to be demolished after the removal of the asbestos.

Plaintiff was hired by S & W as an asbestos abatement worker in 1995. In the six years before joining S & W, he had been intermittently employed in asbestos abatement, which included removing asbestos materials from roofs. Plaintiff served as a foreman at the Riverside project. S & W adopted a tag-team approach to the removal of the roofing materials with some of the workers peeling back the outermost layer of roof and others transporting the debris to a dumpster. That process was to be repeated through multiple layers until the roof was stripped down. On January 23, 1996, after approximately one month on the project, plaintiff fell through the roof up to his underarms, striking his back on a roof beam or joist. Plaintiff required two operations and ultimately was rendered disabled by his injuries. As a result of that accident, plaintiff applied for and received a workers' compensation award.

As previously noted, no one disputes that Henderson, the president of S & W, was well aware of the roof's dangerous condition. What is contested is plaintiff's knowledge of that condition. Henderson, who has been in the asbestos removal business since

1989, stated that he went "over the job thoroughly with [his] foremen," one of whom was plaintiff. Henderson testified at length that he was the conduit of information between NJT and S & W, answering all his foremen's questions and "go[ing] to the consultant or . . . [NJT]" with any questions he could not answer, and that plaintiff knew first-hand the perilous condition of the roof. Plaintiff claimed that he was not informed of any dangers related to removing asbestos from the roof.

On July 24, 1997, plaintiff filed a complaint to recover damages from NJT based on the injuries he suffered when he fell through the roof. NJT answered and filed a third-party complaint against S & W, seeking contractual indemnity. The trial court ordered S & W to indemnify NJT in its defense against plaintiff. The trial court ultimately granted NJT's summary judgment motion to dismiss plaintiff's suit, reasoning that (1) NJT had no duty to protect plaintiff, an employee of an independent contractor, from a hazard that was incidental to the very work the contractor was hired to perform; (2) NJT was not liable for any unreasonable or negligent inspection under *N.J.S.A.* 59:2–6; and (3) NJT's conduct with regard to any dangerous condition of its property was not palpably unreasonable under *N.J.S.A.* 59:4–2.

The Appellate Division agreed that NJT was a public entity and affirmed the grant of summary judgment, but only for the first reason expressed by the trial court. The Appellate Division concluded that "immunity for negligent inspection is not available to the public entity when the plaintiff's suit is based on the entity's failure to protect against a dangerous condition of its property." The Appellate Division further held that whether a public entity acted in a palpably unreasonable manner is generally a question of fact for the jury. We granted plaintiff's petition for certification. 174 *N.J.* 38, 803 *A.*2d 634 (2002).

## II

Plaintiff argues that NJT should be held accountable by the same standard as any other private landowner for the dangerous

condition at the Riverside garage. Unlike private actors, public entities are subject to liability only within the terms of the TCA. Plaintiff contends that NJT is not a public entity falling within the TCA's protection.

In previous tort claim cases before this Court in which NJT has been a defendant, we, as well as the parties, have presumed NJT to be a public entity. In *Ross v. Transport of New Jersey*, 114 *N.J.* 132, 553 *A.*2d 12 (1989), we considered whether NJT was required to maintain insurance for personal injury claims arising from vehicular accidents involving its buses, specifically uninsured motorist insurance. The status of NJT as a public entity was not disputed. We held that "[o]n a policy level, there is considerable substance to the view that the liability of public entities ought to be circumscribed or limited as reflected by the Tort Claims Act. As such, [NJT], as a public entity, is covered by the protections of the Tort Claims Act." *Id.* at 145, 553 *A.*2d 12 (citation omitted). In *Ross*, we cited with approval *Transport of New Jersey v. Matos*, 202 *N.J.Super.* 571, 495 *A.*2d 503 (Law Div.1985), in which the Law Division analyzed the legislative history of NJT's enabling statute, the Public Transportation Act of 1979, *N.J.S.A.* 27:25-1 to –34, as well as other statutes governing NJT, and drew the "inescapable conclusion" that NJT is a public entity. *Ross, supra,* 114 *N.J.* at 138, 145–46, 553 *A.*2d 12 (discussing *Matos, supra,* 202 *N.J.Super.* at 573–75, 495 *A.*2d 503). *See also Gibson–Homans Co. v. New Jersey Transit Corp.*, 560 *F.Supp.* 110, 113 (D.N.J.1982) (holding that NJT is State's alter ego and therefore defeats diversity jurisdiction). *See also Cavuoti v. New Jersey Transit Corp.*, 161 *N.J.* 107, 132–34, 735 *A.*2d 548 (1999) (holding that in Law Against Discrimination case punitive damages could be awarded against NJT as public entity; NJT's status as public entity not challenged).

The underpinnings of that conclusion in *Matos* are clear. The TCA defines a "public entity" as "includ[ing] the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State" but

excludes "independent contractors." *N.J.S.A.* 59:1–3. In the findings and declarations section of the Public Transportation Act, which established NJT, the Legislature found that

[a]s a matter of public policy, it is the responsibility of the State to establish and provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner.

. . . .

... In furtherance of these findings and declarations, a public corporation shall be created with the necessary powers to accomplish the purposes and goals set forth in this section, including the power to acquire and operate public transportation assets.

[*N.J.S.A.* 27:25–2b, e.]

Further, the Public Transportation Act provides that NJT is "constituted as an instrumentality of the State exercising public and essential governmental functions, and the exercise by the corporation of the powers conferred by this act shall be deemed and held to be an essential governmental function of the State." *N.J.S.A.* 27:25–4a.

Plaintiff argues that because *N.J.S.A.* 59:1–3 excludes any entity which can "sue or be sued" from the statutory definition of "State," NJT does not fall under the protective umbrella of the TCA. NJT can sue and be sued pursuant to *N.J.S.A.* 27:25–5a. As defined by the TCA, however, the State is only one category of public entity. *N.J.S.A.* 59:1–3. Public entity is not limited to the State or one of its subdivisions; it includes such public authorities as the New Jersey Turnpike Authority, the New Jersey Highway Authority, and the New Jersey Sports and Exposition Authority, to name but a few, all of which can sue or be sued and all of which are covered by the TCA. Comment to *N.J.S.A.* 59:1–3. *See also S.E.W. Friel Co. v. N.J. Turnpike Auth.*, 73 *N.J.* 107, 118, 373 *A.*2d 364 (1977); *Vanchieri v. New Jersey Sports and Expo. Auth.*, 104 *N.J.* 80, 85, 514 *A.*2d 1323 (1986).

■ In addressing whether the New Jersey Turnpike Authority was a public entity, this Court reasoned:

The definitional section of public entity by its terms includes public authorities as entities separate from the "State." Therefore, the exclusionary proviso in the definition of State appears to be merely a reiteration of the separateness from the

State of public authorities which have statutory power to sue even if they are nominally within a department of the State.

[*S.E.W. Friel Co., supra,* 73 *N.J.* at 115, 373 *A.*2d 364.]

The logic of those words applies equally to this case. We now remove any doubt and declare that NJT is a public entity within the ambit of the TCA.

## III

The liability of a public entity for an injury caused by a dangerous condition on its property is circumscribed by *N.J.S.A.* 59:4–2. Therefore, we begin our analysis with the language of the statute:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

*Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.*

[*N.J.S.A.* 59:4–2 (emphasis added).]

Plaintiff must prove the following elements to succeed in this case: (1) the roof of the Riverside garage was in dangerous condition; (2) the dangerous condition created a foreseeable risk of, and actually caused, injury to plaintiff; (3) NJT knew of the dangerous condition; and (4) the action taken by NJT to protect against the dangerous condition was palpably unreasonable.

A dangerous condition is defined in the TCA as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a. *See also Vincitore ex rel. Vincitore v. New Jersey Sports and*

*Expo. Auth.,* 169 *N.J.* 119, 123, 125, 777 *A.2d* 9 (2001) ("Whether property is in a 'dangerous condition' is generally a question for the finder of fact. . . . Thus the standard is whether any member of the general public who foreseeably may use the property would be exposed to the risk created by the alleged dangerous condition." (citations omitted)).

For purposes of this appeal, we accept that the roof was in dangerous condition, that NJT knew of that condition, that the injury suffered by plaintiff was reasonably foreseeable, and that plaintiff was an employee of S & W. Neither party seriously disputes those facts. The question is whether, in light of the repeated warnings given to S & W, although not to plaintiff personally, NJT's actions were not palpably unreasonable. Implicated in this question is whether a public entity discharges its duty by giving warnings to an independent contractor it hires to perform inherently dangerous work on its property or whether its duty extends to providing individual warnings to each of the contractor's employees. NJT is only entitled to summary judgment if NJT's disclosure of the unstable and unsafe condition of the roof to the president of S & W is sufficient to show that it did not act in a palpably unreasonable manner.

Plaintiff bears the burden of proving that NJT acted in a palpably unreasonable manner. *Holloway v. State,* 125 *N.J.* 386, 403, 593 *A.2d* 716 (1991); *Kolitch v. Lindedahl,* 100 *N.J.* 485, 494, 497 *A.2d* 183 (1985). Although palpably unreasonable is not defined by the TCA, this Court has used the following definition:

> For today's purposes we accept what was stated in *Williams v. Phillipsburg,* 171 *N.J.Super.* 278, 286, 408 *A.2d* 827 (App.Div.1979), in which the court differentiated the term "palpably unreasonable" from ordinary negligence:
>
>> We have no doubt that the duty of ordinary care, the breach of which is termed negligence, differs in degree from the duty to refrain from palpably unreasonable conduct. The latter standard implies a more obvious and manifest breach of duty and imposes a more onerous burden on the plaintiff.
>
> We conclude that the term implies behavior that is patently unacceptable under any given circumstance. As one trial court has suggested, for a public entity to have acted or failed to act in a manner that is palpably unreasonable, "it must be

manifest and obvious that no prudent person would approve of its course of action or inaction."

[*Kolitch, supra,* 100 *N.J.* at 493, 497 *A.*2d 183 (quoting *Polyard v. Terry,* 148 *N.J.Super.* 202, 216, 372 *A.*2d 378 (Law Div.1977), *rev'd on other grounds,* 160 *N.J.Super.* 497, 390 *A.*2d 653 (App.Div.1978), *aff'd o.b.,* 79 *N.J.* 547, 401 *A.*2d 532 (1979)).]

*See also Holloway, supra,* 125 *N.J.* at 403–04, 593 *A.*2d 716 (quoting *Kolitch, supra,* 100 *N.J.* at 493, 497 *A.*2d 183). Part of the equation in determining whether a public entity acted in a palpably unreasonable manner involves the exercise of its "discretion in determining what action should or should not have been taken." *Brown v. Brown,* 86 *N.J.* 565, 575, 432 *A.*2d 493 (1981).

## IV

S & W's status as an independent contractor forms an important part of the analysis in determining the scope of NJT's duty and liability to S & W and its employees. In hiring S & W, NJT relinquished control over the means and methods of asbestos removal. NJT relied on the expertise and experience of S & W and did not supervise or direct the project.

"An independent contractor is a person 'who, in carrying on an independent business, contracts to do a piece of work according to his own methods without being subject to the control of the employer as to the means by which the result is to be accomplished....' " *Bahrle v. Exxon Corp.,* 145 *N.J.* 144, 157, 678 *A.*2d 225 (1996) (quoting *Wilson v. Kelleher Motor Freight Lines, Inc.,* 12 *N.J.* 261, 264, 96 *A.*2d 531 (1953)). *See also AT & T v. Winback and Conserve Program, Inc.,* 42 *F.*3d 1421, 1435 (3d Cir.1994) ("If, however, the agent ... is only subject to the general control and direction by the principal, the agent is termed an independent contractor."), *cert. denied,* 514 *U.S.* 1103, 115 *S.Ct.* 1838, 131 *L.Ed.*2d 757 (1995). S & W clearly was an independent contractor of NJT.

NJT contends that it discharged its common-law landowner duty by warning S & W of the roof's poor condition and that the risks incident to the removal of the asbestos from the roof

were inherent to the very project for which S & W was hired. In determining whether NJT acted in a palpably unreasonable manner, we necessarily must look to NJT's duty as a landowner in relation to its employment of an independent contractor, S & W. The legislative history makes clear that the Legislature did not intend to nullify common-law actions for landowner liability in enacting the TCA. "It is anticipated that this section [*N.J.S.A.* 59:4–2] will be developed to the extent possible in accordance with common law principles of landowner liability." Comment to *N.J.S.A.* 59:4–2. The general rule is that "[o]rdinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract." *Bahrle, supra,* 145 *N.J.* at 156, 678 *A.2d* 225. *See also Baldasarre v. Butler,* 132 *N.J.* 278, 291–93, 625 *A.2d* 458 (1993) ("Generally ... the principal is not vicariously liable for the torts of the independent contractor if the principal did not direct or participate in them."). In *Majestic Realty Associates, Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 153 *A.2d* 321 (1959), this Court instructed:

> The problem must be approached with an awareness of the long settled doctrine that ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance (as our cases put it), he is not liable for the negligent acts of the contractor in the performance of the contract. Certain exceptions have come to be accepted, *i.e.,* (a) where the landowner retains control of the manner and means of the doing of the work which is the subject of the contract; (b) where he engages an incompetent contractor, or (c) where, as noted in the statement of the general rule, the activity contracted for constitutes a nuisance *per se.*

[*Id.* at 430–31, 438, 153 *A.2d* 321 (citations omitted).]

Developing a project and directing that it be completed within a certain timeframe and within certain specifications do not constitute interference with the project and remain within the "general supervisory power over the result to be accomplished rather than the means of that accomplishment." *Mavrikidis v. Petullo,* 153 *N.J.* 117, 136, 707 *A.2d* 977 (1998).

█ NJT, through its representatives, thoroughly discussed the condition of the site with S & W at the pre-bid meeting, the site inspection, and the pre-project meeting. S & W knew of the

condition of the Riverside garage and the perils and risks of removing asbestos from the roof. NJT satisfied its duty to inspect the premises and to identify any dangerous conditions. *See Handleman v. Cox,* 39 *N.J.* 95, 111, 187 *A.2d* 708 (1963). Simply stated, the dilapidated condition of the roof was a component of the project and known to both NJT and S & W. Plaintiff was injured as he was performing the very work his employer, S & W, was hired to do.

### V

We must next determine whether NJT acted in a palpably unreasonable manner by not warning directly S & W's employees, such as plaintiff, of the condition of the roof. Stated differently, was it palpably unreasonable for NJT to expect S & W to inform its workers of the dangers inherent to the project? Plaintiff's status as an employee of an independent contractor must play an integral role in determining what duty, if any, NJT owed directly to plaintiff. NJT exercised no direct control over plaintiff. No orders issued from NJT to plaintiff, and plaintiff answered to S & W alone. Instead, plaintiff, as S & W's employee, took direction from S & W management, received all materials and protective gear used on the project from S & W, was paid exclusively by S & W, and ultimately received a workers' compensation award through his employment with S & W. Nevertheless, plaintiff claims that NJT had a duty to inform him personally of the dangers incident to removing asbestos from the roof of the Riverside garage.

"[T]he general principle is that the landowner is under no duty to protect an employee of an independent contractor from the very hazard created by the doing of the contract work," provided that the landowner does not retain control over the means and methods of the execution of the project. *Gibilterra v. Rosemawr Homes,* 19 *N.J.* 166, 170, 115 *A.2d* 553 (1955). In *Wolczak v. National Electric Products Corp.,* 66 *N.J.Super.* 64, 71, 168 *A.2d* 412 (App.Div.1961), the Appellate Division held that "[a]bsent control over the job location or direction of the manner

in which the delegated tasks are carried out," the party contracting out the work, be it a landowner or a general contractor, "is not liable for injuries to employees of the [ ]contractor resulting from either the condition to the premises or the manner in which the work is performed." Further, "[t]his immunity [is not] disturbed by the exercise of merely such general superintendence as is necessary to insure that the [ ]contractor performs his agreement. . . ." *Ibid.* That is so especially when the contractor

> is an experienced laborer hired either to correct the very danger present or to perform his tasks amidst the visible hazards. The landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which are part of or incidental to the very work the contractor was hired to perform.

[*Id.* at 75, 168 *A.*2d 412 (citations omitted).]

*See also Accardi v. Enviro–Pak Sys. Co., Inc.,* 317 *N.J.Super.* 457, 463, 722 *A.*2d 578 (App.Div.) (stating that "landowner may assume that the independent contractor and her employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety"), *certif. denied,* 158 *N.J.* 685, 731 *A.*2d 45 (1999); *Dawson v. Bunker Hill Plaza Assoc.,* 289 *N.J.Super.* 309, 318, 673 *A.*2d 847 (App. Div.), *certif. denied,* 146 *N.J.* 569, 683 *A.*2d 1164 (1996); *Sanna v. Nat'l Sponge Co.,* 209 *N.J.Super.* 60, 67, 506 *A.*2d 1258 (App.Div. 1986).

█ It was not palpably unreasonable for NJT to expect that S & W would inform its employees of the dangers inherent to the project. NJT had the burden of protecting against a dangerous condition on its property, and it chose to satisfy that burden through warnings to S & W. S & W's president fully acknowledged his understanding of the unsafe condition of the roof and the hazards attendant to removing asbestos from that area. The absence of any dispute that S & W knew of the roof's condition makes this matter appropriate for summary judgment.

We conclude that NJT did not act in a palpably unreasonable manner by not informing directly each of the employees of the independent contractor of the danger and risks involved in removing asbestos from the roof of the garage. The duty to give warnings to its employees fell to S & W, the experienced independent contractor that had the requisite knowledge of the condition of the roof and had undertaken the means and methods for removal of the asbestos. NJT neither directly supervised the project nor interfered with its execution. In those circumstances, it would be impractical, if not impossible, to require a public entity, which hires an independent contractor with tens or hundreds of employees, to warn each individual worker on the site. NJT fulfilled its duty to plaintiff by warning his employer, S & W, the independent contractor responsible on the worksite, of the danger. Plaintiff was not left without a remedy. He filed for and received a workers' compensation award through his employment with S & W. In that respect, plaintiff was no worse off than had he been an employee of NJT itself.

## VI

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.