841 A.2d 962 (2004)
366 N.J. Super. 578
Edward T. COYNE and Sandra Coyne, his wife, Plaintiffs-Appellants,
v.
STATE of New Jersey, Department of Transportation, Vincent M. McDaniel, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2003.
Decided February 19, 2004.
*963 E. Drew Britcher, Morristown, argued the cause for appellants (Britcher, Leone & Roth, attorneys; Mr. Britcher, of counsel; Michael A. Quinn, Mount Laurel, and Jessica E. Choper, Lawrenceville, on the brief).
Howard N. Nirenberg argued the cause for respondents (Nirenberg & Varano, attorneys; Mr. Nirenberg and Sandra N. Varano, on the brief).
Before Judges KESTIN, AXELRAD and WINKELSTEIN.
The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiffs, Edward Coyne (Coyne or plaintiff) and his wife Sandra Coyne, who has filed a per quod claim, appeal from the Law Division's summary judgment dismissing their complaint against the State of New Jersey and Vincent McDaniel, a state employee. Coyne was injured when a van he was driving collided with a vehicle *964 McDaniel was driving as part of a highway barrier-cleaning operation, which involved cleaning debris from the shoulder adjacent to the barrier that divided the north and southbound sides of the road. The judge dismissed plaintiff's complaint on the grounds that defendants were immune under the New Jersey Tort Claims Act (Act), N.J.S.A. 59:1-1 to12-3, specifically N.J.S.A. 59:2-3a, which immunizes both public employees and public entities for the exercise of discretion within the scope of employment. See Willis v. Dept. of Conservation & Econ. Dev., 55 N.J. 534, 540, 264 A.2d 34 (1970); Cobb v. Waddington, 154 N.J.Super. 11, 16, 380 A.2d 1145 (App.Div.1977), certif. denied, 76 N.J. 235, 386 A.2d 859 (1978). We affirm.

I
The following facts were before the court when it decided the summary judgment motion. On December 14, 1998, at approximately 1:00 p.m., plaintiff was traveling north in a commercial van on Route 287 in Montville Township. According to plaintiff, he was in the left lane, driving between sixty-five and seventy miles per hour (mph), behind an eighteen-wheel tractor-trailer, with another truck in the center lane beside him. Suddenly, the tractor-trailer that was traveling in front of plaintiff moved into the center lane. As it did so, plaintiff first observed the New Jersey Department of Transportation (DOT) truck that McDaniel was driving. McDaniel's truck had an electric arrowboard mounted on it, with a flashing arrow, pointing to the righttoward the center lane of the highway. McDaniel's truck was in the left lane, and, according to plaintiff, it "appeared to be still."
Once plaintiff saw the DOT truck, he tried to move to the center lane, but he could not do so or stop in time. He crashed his van into the right rear of the DOT truck, causing him serious injuries. The accident took place at milepost 48.4, where the speed limit was 65 mph. Plaintiff had clear visibility and had the tractor-trailer not been in front of him, he could have seen the DOT truck from a sufficient distance to avoid hitting it. He said he "could have seen it ... five miles back." Plaintiff denied seeing any warning signs before the accident site, which indicated that the left lane of the highway would be closed ahead.
At the time of the accident, the DOT employees were conducting a shoulder-cleaning, or barrier-cleaning operation, which involved cleaning debris from the barrier that divides the north and southbound sides of the highway. Multiple vehicles were involved in the cleaning operation, including a mechanical sweeper, a dump truck, a pick-up truck with strobe lights driven by Gregory Rusnak, and the dump truck driven by McDaniel that contained an impact attenuator and a flashing directional arrowboard. A work crew walked in front of the DOT vehicles, removing debris from the shoulder of the road adjacent to the barrier. At various times, the sweeper and dump truck were required to stop so the debris could be taken from the sweeper and placed into the dump truck. Because the width of the shoulder varied, it was necessary for the mechanical sweeper to travel both along the shoulder of the road and in the left lane of the roadway. According to witnesses and the police report, another truck was located between one-half and one mile behind the clean-up operation. That truck, which moved in conjunction with the work detail, contained a flashing sign on it that said "left lane closed ahead."
The truck driven by McDaniel performed three safety functions. The arrowboard mounted on the truck alerted oncoming drivers to move to the center lane; *965 the vehicle protected the work detail that was walking ahead of it; and by virtue of its impact attenuator, the truck protected oncoming drivers who could strike the rear of an otherwise unprotected vehicle.
Both the spacing of and the order in which the DOT vehicles were proceeding along the highway were disputed. The testimony of the witnesses was not consistent concerning how many vehicles were in the convoy and exactly where the vehicles were located in relation to each other. These disputes are not material, however, to the undisputed fact that McDaniel's vehicle was in the left lane when struck by plaintiff.
The speed of both plaintiff's and McDaniel's vehicles at the time of the accident was also in dispute. Plaintiff said McDaniel's truck was not moving at the time of impact. McDaniel, on the other hand, when asked to estimate his rate of speed at the time of the collision, said: "Maybe fifteen miles an hour."
Plaintiff testified he was traveling sixty-five to seventy mph prior to impact. According to Leonard Stanfield, an independent witness who gave a statement to plaintiff's investigator, as plaintiff passed Stanfield going north on Route 287, "he was acceleratingI don't think he was speeding because I was doing around 60-62, his speed was 65 or less. He was in a regular position to pass me when he [saw] the construction truck [and] he accelerated." Another independent witness, Raymond Kazlauskas, told the investigating state trooper that plaintiff's vehicle "was moving pretty fast, my truck was set [at] 65 mph. He went by me fast. I estimate his speed at approx. 70+ mph."
Whether DOT employees had placed a sign on a truck in the median, in an area south of the work detail site, is not genuinely disputed. Plaintiff denied seeing such a sign; but, the other witnesses did. Kazlauskas said that prior to coming upon the accident site he "saw a sign in the median which said `left lane closed ahead, roadwork.'" The state trooper who was at the accident scene noted in his report that, "DOT had posted a sign board prior to the work detail which stated `left lane closed ahead.'" Plaintiff's expert's report indicated that the DOT "had posted a signboard prior to the work detail which stated `left lane closed ahead.'"
Rusnak, who was driving a DOT pick-up truck in the convoy, said the first warning sign a motorist would encounter prior to coming upon the work detail would have been the "big flashing sign on top of a five-man dump truck that read `left lane closed ahead.'" The truck was located approximately three-quarters of a mile behind the work detail, in the grassy area on the left, just off the shoulder. The driver of the truck on which the sign was mounted kept the truck approximately three-quarters of a mile behind the work detail. Rusnak noted that although the DOT Safety Manual (manual) did not require this warning, the sign was placed on the truck as an extra safety measure. John Scala, the DOT crew supervisor, said "the message board ... wasn't even required [by the manual]. We decided to put it out anyway."
The width of the left shoulder in the area of the accident is disputed. The left shoulder width varied along Route 287. According to plaintiff's engineering expert, John Lacz, the width varied from three feet to twelve feet, and near the point of the accident the shoulder was approximately three feet wide. Lacz never stopped to measure the shoulder, but "gauged" its width while driving his vehicle along the road. Lacz testified at his deposition that a three-foot shoulder was the equivalent of "no shoulder," but he acknowledged no authority to support that *966 position and he did not arrive at that conclusion in his written report. Mark Marpet, the State's engineering expert, who measured the left shoulder, noted in his report that between the mileposts where the accident took place, "the shoulder is of full width," and he "was able to drive fully on the shoulder with approximately two feet of clearance between [his] vehicle and both the median barrier and the left travel-lane's left edge line." John Deighan, one of plaintiff's co-workers who was driving on Route 287 about five minutes behind plaintiff on the day of the accident, testified at his deposition that the shoulder to the left of the road was slightly narrower than the traveled roadway.
Scala said the barrier cleaning on the day of the accident was considered a "slow moving" operation under the terms of the manual. The pertinent provisions of the manual read:
FOREWORD
The safety rules in this manual are based on years of practical experience combined with knowledge gained from a great many national accident prevention studies....
* * *
SECTION I
GENERAL RULES
Employee Responsibilities & Duties
1. Every employee shall adhere to the safety rules and regulations as set forth in this manual.
* * *
SECTION II
TRAFFIC PROTECTION (ROADWAY WORK OPERATIONS) TRAFFIC PROTECTION DURING ROADWAY WORK OPERATIONS
1. NO ONE STANDARD SEQUENCE OF SIGNS OR OTHER TRAFFIC CONTROL DEVICES CAN BE SET UP AS AN INFLEXIBLE ARRANGEMENT FOR ALL SITUATIONS DUE TO THE VARIETY OF CONDITIONS ENCOUNTERED. A ROAD CREW'S RESPONSIBILITY SHOULD BE DIRECTED TOWARD THE SAFE AND EXPEDITIOUS MOVEMENT OF TRAFFIC THROUGH A CONSTRUCTION OR MAINTENANCE WORK SITE, AND TO THE SAFETY OF THE WORK FORCE PERFORMING THESE OPERATIONS.
2. IT SHALL BE THE RESPONSIBILITY OF THE PERSON IN CHARGE TO INSTITUTE THE PLACING OF ALL APPROPRIATE CAUTIONARY DEVICES AND CONTROLS AS MAY BE REQUIRED FOR THE PARTICULAR JOB. IT SHOULD BE EMPHASIZED THAT THESE ARE MINIMUM DESIRABLE STANDARDS FOR NORMAL SITUATIONS AND THAT ADDITIONAL PROTECTION SHOULD BE CONSIDERED WHEN COMPLEXITIES AND HAZARDS PREVAIL.
* * *
4. In particular situations not adequately covered by the provision of this section, the protection of the traveling public and of the workmen on the scene will dictate the measures to be taken, consistent with the general principles set forth.
* * *
Slow Moving Operations
1. On any slow moving operation such as random patching, scraping, mechanical sweeping, line stripping, litter patrol, etc., conducted in the active or part of the active lanes of a roadway, where the speed limit exceeds 35 MPH an electric *967 arrowboard shall be towed or mounted to the back-up vehicle. The back-up vehicle will maintain a distance of 75 to 150 ft. from the vehicle or work operation. If an electric arrowboard is not available, the "All Traffic Arrowboard" with flashing lights may be used and must be mounted high enough to be visible by approaching traffic. (emphasis added).
2. On interstate highways that do not contain a shoulder area, standard traffic control devices and lane closure procedures shall be used.
3. On any slow moving work operation where the speed limit is less than 35 MPH a flagperson is permissible in lieu of an arrowboard. An example would be such as entrance and exit ramps, school zones or secondary highways.
II
Judge Dangler granted defendants' motion for summary judgment. Although he found genuine issues of material fact as to whether plaintiff was negligent in the operation of his vehicle, focusing on N.J.S.A. 59:2-3, the judge found no disputes of material fact concerning whether defendants followed the procedures established in the manual. He stated:
I do not find ... a genuine issue of material fact ... as to whether the [DOT] employees violated ... the safety manual that was in place....
The safety manual specifically refers to what the crew must do, with regard to the vehicle and the arrow. And I do find that there really is no genuine issue of fact, as to the manner in which they were operating this truck, ... to having the arrow pointing to traffic going in the center lane.
It appears that all of the actions ... of the crew ... were in conformance with the manual....
* * *
It brings us ... to [N.J.S.A.] 59:2-3, discretionary activities.... I find that the conduct here of the State ... was within the immunity that the State does get from Title 59, that ... the conduct here was protected by the statute.
* * *
[W]e really don't reach ... the palpably unreasonable aspect of [N.J.S.A.] 59:4-2.... I don't find here that there was any outrageous conduct at all by the ... crew of the [DOT].
III
Because plaintiff's complaint was dismissed on summary judgment, we view the evidence to support his argument in a light most favorable to him. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). A court ruling on a summary judgment motion should not deny a deserving litigant his or her day in court, but, "[t]o send a case to trial, knowing that a rational jury can reach but one conclusion, is indeed `worthless' and will `serve no useful purpose.'" Id. at 540-41, 666 A.2d 146 (quoting Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 77, 110 A.2d 24 (1954) (internal quotation omitted)).
We begin our discussion with an examination of the immunities provided by N.J.S.A. 59:2-3. That statute states, in part:
Discretionary activities
a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;
[N.J.S.A. 59:2-3a].
*968 Planning-level or discretionary decisions are entitled to this immunity; operational or ministerial actions are not. Kolitch v. Lindedahl, 100 N.J. 485, 495, 497 A.2d 183 (1985). "A discretionary act... calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Ibid. (quotations omitted); see also Morey v. Palmer, 232 N.J.Super., 144, 153, 155, 556 A.2d 811 (App.Div.1989) (holding police officer's decision to order intoxicated man out of street and leave scene, only for man to be struck and killed by car three hours and forty minutes later a quarter mile away, was discretionary decision that was immune from liability). Other examples of discretionary decisions include whether to use resources for road maintenance, to use patching or resurfacing to repair a road, and choosing which roads should be repaired. Costa v. Josey, 83 N.J. 49, 55, 415 A.2d 337 (1980).
Immunity provisions, in the Act or at common law, prevail over liability provisions. 1972 Task Force Comment to N.J.S.A. 59:2-1(b). Liability on the part of the State "cannot be imposed unless consistent with the entire [Act] itself." Kolitch, supra, 100 N.J. at 492, 497 A.2d 183. Public entities are liable in New Jersey for their negligence only as set forth in the Act, and "any liability of a public entity established by [the Act] is subject to any immunity of the public entity." Berends v. City of Atlantic City, 263 N.J.Super. 66, 76, 621 A.2d 972 (App.Div.1993) (citing Pico v. State, 116 N.J. 55, 59, 560 A.2d 1193 (1989), quoting N.J.S.A. 59:2-1).
Plaintiff concedes the manual was the product of high-level decision making and is therefore immunized pursuant to N.J.S.A. 59:2-3a. Instead of challenging the manual, plaintiff argues the DOT employees should have taken additional precautions in addition to those set forth in the manualby the use of either traffic cones or a flagpersonbecause the left shoulder of the highway was too narrow to warrant the procedures established in the manual for slow moving operations. Plaintiff also claims this was not a slow moving operation because the convoy of trucks was required to stop at times to allow the debris to be placed into dump trucks; consequently, plaintiff asserts it was palpably unreasonable for the DOT employees not to close the left lane, or give additional warnings over and above the minimal requirements established in the manual. We do not find plaintiff's arguments to be persuasive.
We find no material distinction between the facts in this case and those in Cobb, supra, 154 N.J.Super. at 16-17, 380 A.2d 1145, where we held that the selection of barricades and their configuration on the highway as a method of channelizing traffic was reflective of the DOT's exercise of judgment and discretion and was immunized under N.J.S.A. 59:2-3a. In Cobb, the DOT hired a private contractor to do road construction. Cobb, supra, 154 N.J.Super. at 14, 380 A.2d 1145. The plaintiff was injured when his car collided with traffic channelization barricades when an unidentified driver forced him off the roadway. Ibid. The choice of what type of barricade to use and the placement of the barricades on the highway was made by the DOT and carried out by the contractor in accordance with DOT specifications. Ibid. We concluded that the selection of the specific type of barricades and their configuration on the highway as a means to channelize traffic reflected "the exercise of judgment and discretion on the part of a public entity within the sense of N.J.S.A. 59:2-3a...." Id. at 16, 380 A.2d 1145. Because the positioning and use of the *969 particular type of barricades "undoubtedly involved the weighing of competing considerations to serve the provisional purpose," the decision called for the "exercise of judgment or discretion vested in the entity." Id. at 16-17, 380 A.2d 1145.
The same holds true here. DOT employees followed the dictates of the manual as it applied to slow moving operations, which includes mechanical sweeping and litter control, "conducted in the active or part of the active lanes of a roadway, where the speed limit exceeds 35 MPH." (emphasis added). McDaniel's truck was in the active part of Route 287, in the left lane, where the speed limit exceeded thirty-five miles per hour. The truck was part of the mechanical sweeping operation where the work detail was removing debris from the left shoulder of the road. An electric arrowboard was mounted on the back of McDaniel's vehicle. The road contained a left shoulder, even though the width of the shoulder in the area of the accident is disputed. Only on interstate highways that do not contain a shoulder are standard traffic control devices and lane closure procedures used.
Under these circumstances, just as the private contractor was following DOT guidelines in Cobb, so was the DOT following its own guidelines in conducting the clean-up operation. In other words, DOT employees were implementing the immunized procedure established in the manual. As the Supreme Court noted in Kolitch, supra, the decision that is discretionary in nature and the act of implementation of that decision are considered "one and the same for purposes of [N.J.S.A. 59:2-3]." 100 N.J. at 496, 497 A.2d 183. Therefore, because the decision establishing the procedures in the manual was discretionary and immunized, when the DOT employees followed those procedures during the clean-up operation, their actions were also immunized.
Plaintiff takes the position that defendants should not have followed the guidelines for slow moving operations because at the site of the accident the roadway did not contain a sufficient shoulder area. All parties agree a shoulder was present; the question is whether the width of the shoulder should have removed the clean-up operation from the umbrella of slow moving operations under the manual. We begin with a review of the evidence as to the size of the shoulder in the area of the accident, then examine plaintiff's argument that the shoulder was too narrow to permit use of the safety precautions established for slow moving operations.
At his deposition, plaintiff agreed that there was a shoulder to the left of the lane where the accident occurred, although he was unsure whether it was wide enough on which to drive. Deighan, plaintiff's coworker, observed a shoulder to the left of the travel lane, wide enough "for a car to be there." Mark Marpet, the State's expert, the only witness to measure the shoulder between the mileposts where the accident took place, found the shoulder to be "of full width;" he "was able to drive fully on the shoulder with approximately two feet of clearance between [his] vehicle and both the median barrier and the left travel-lane's left edge line."
Lacz, plaintiff's expert, agreed there was a shouldertestifying that the shoulder width within the accident area was "three feet plus"but, without citing any authority to support his opinion, did not consider a three-foot-wide shoulder sufficient to allow a slow moving operation as defined in the manual. He claims the narrow shoulder should have required additional safety measures because, as he said in his report, "[w]ith the shoulder changing in width and configuration, it will be necessary *970 for the street sweeper to move into the fast lane when the left shoulder decreases to 3' and there is the NJ concrete barrier. Where the shoulder extends to 10' or 12', then the sweeper would travel on the shoulder."
The implication of Lacz's opinion is that vehicles engaged in slow moving operations are limited to use of the shoulder of the road, and the procedures in the manual would be violated if the DOT vehicles were required to travel in the active lane of the roadway. That is simply not what the manual says. The manual does not require that the shoulder be wide enough for the sweeper or other vehicles to ride on without encroaching on the travel portion of the highway. The manual calls for a shoulder; it does not require a shoulder to be any particular width. Nor does it require the vehicle convoy to be contained solely on the shoulder. Rather, the manual anticipates that the active lanes of the roadway are to be used by the vehicles in the work detail. It states that slow moving operations, which include mechanical sweeping and litter patrol, are "conducted in the active or part of the active lanes of a roadway...." As these procedures were the product of heightened decision-making, they are immunized.
Consistent with these dictates, the convoy of trucks protecting the work detail was proceeding in the active left lane of the road. While the work detail and the debris sweeper were necessarily on the shoulder when cleaning the debris from the barrier area, DOT procedures did not require the support vehicles to limit their travel to the shoulder of the highway. When McDaniel's vehicle was struck by plaintiff, it was in the left lane, where it was permitted to be. That the mechanical sweeper, which was located ahead of McDaniel's vehicle, may also have also traveled in the left lane where the shoulder was narrow, did not violate the safety requirements for a slow moving operation as established in the manual, or contribute to the accident.
Whether McDaniel's vehicle was stationary at the time of the accident, or moving slowly, is also of no moment. Concededly, mechanical sweeping and litter patrol requires the vehicles to proceed slowly and stop on occasion. Yet, when the manual was prepared, the decision was made to include these functions as "slow moving" operations. We may not second-guess the wisdom of that decision, which was made by high-level decision-makers, based on "years of practical experience combined with knowledge gained from many national accident studies."
Plaintiff further argues that the manual established only minimal standards, and under the facts of this case, additional safety precautions should have been implemented. Specifically, the manual states that "[i]t should be emphasized that these are minimal desirable standards for normal situations and that additional protection should be considered when special complexities and hazards prevail." It also indicates that "[i]n particular situations not adequately covered by the provision of this section, the protection of the traveling public and of the workmen on the scene will dictate the measures to be taken, consistent with the general principles set forth." However, plaintiff fails to point to any "special complexities and hazards," or any other reason, which would have required the State to take additional precautions not enumerated under the slow moving operations section of the manual. The manual authorized this particular type of work detail on a roadway with a speed limit in excess of thirty-five mph. The weather was clear, and the roadway was dry. No special traffic conditions existed at the time of the accident that would have required DOT employees to channelize *971 traffic or impose additional control devices or lane closure procedures. Nevertheless, DOT employees did take an additional safety precaution not required by the manual. They had posted a signboard on a truck approximately three-quarters of a mile before the work detail that stated "left lane closed ahead."
In his dissent, our colleague agrees with plaintiff's position that because the manual establishes only minimal standards, plaintiff should be entitled to submit plenary proofs as to whether the work detail acted reasonably in deciding which safety features to implement. We respectfully disagree. At the time the summary judgment motion was filed, the issues had been joined for almost two years. Extensive discovery had been completed. At least eleven persons had been deposed that we are aware of, including plaintiff, his expert, all of the witnesses to the accident, as well as the members of the work detail. It is safe to assume that, at least as to the liability aspect of the case, the facts before the motion judge were essentially those that would have been presented to a fact-finder. Yet, neither plaintiff, nor the dissent, has been able to point to any disputed material facts in the record that would create a genuine issue as to the application of the Act's immunity to the work detail's decision concerning what safety procedures to implement for the barrier cleaning operation in question. The work detail followed the procedures set forth in the manual, and no traffic or other conditions evidencing "special complexities [or] hazards" were extant to warrant additional safety precautions, or otherwise undermine the reasonableness of its actions.
Undoubtedly, there are risks attendant to any type of clean-up operation that takes place on an active roadway. Because the debris itself, if not removed, could cause a safety hazard, the public entity responsible for maintenance of the roadway must decide, in its exercise of discretion, the best way to remove the debris. The State decided that the appropriate procedure would not be to close the roadway or a specific lane, but to provide the traveling public with appropriate warnings. Although this methodology obviously presents hazards, short of closing the highway completely, no doubt hazards would also exist by the use of a flagperson or the use of traffic channelization or barriers. See Cobb, supra, 154 N.J.Super. at 14, 380 A.2d 1145 (accident caused by placement and design of traffic barricades on active roadway during road construction).

IV
Plaintiff claims the court erred by finding defendants' conduct was not palpably unreasonable pursuant to N.J.S.A. 59:4-2. That statute, in part, states:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in [a] dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
* * *
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or *972 the failure to take such action was not palpably unreasonable.
"Palpable unreasonableness connotes a `more obvious and manifest breach of duty' than mere negligence, and `implies behavior that is patently unacceptable under any given circumstance.'" Gaskill v. Active Envtl. Techs., Inc., 360 N.J.Super. 530, 536, 823 A.2d 878 (App. Div.2003). A plaintiff bears the burden to prove that a defendant acted in a way that was "palpably unreasonable." Muhammad v. N.J. Transit, 176 N.J. 185, 195, 821 A.2d 1148 (2003). Whether conduct was "palpably unreasonable" is ordinarily a jury question. Black v. Borough of Atl. Highlands, 263 N.J.Super. 445, 451-52, 623 A.2d 257 (App.Div.1993).
Here, as the motion judge recognized, because any immunity provision in the Act prevails over the liability provisions, N.J.S.A. 59:2-1b, the issue of whether the actions of the DOT work detail were palpably unreasonable is not reached so long as defendants' actions are immunized. See Simon v. Nat. Cmty. Bank of New Jersey, 282 N.J.Super. 447, 458-59, 660 A.2d 558 (App.Div.) ("approach should be whether an immunity applies and if not, should liability attach.") (citing Attorney General's Task Force on Sovereign Immunity Report accompanying N.J.S.A. 59:2-1, as found in Margolis & Novack, Claims Against Public Entities, 1972 Task Force Comment on N.J.S.A. 59:2-1 (Gann, 1994)), certif. denied, 143 N.J. 322, 670 A.2d 1063 (1995); see also Margolis & Novack, Claims Against Public Entities, comment on N.J.S.A. 59:2-1 (Gann, 2003) (N.J.S.A. 59:2-1b subordinates liability to all immunities available to public entity). Accordingly, having agreed with the motion judge that defendants' actions were immunized, it is unnecessary for us to decide whether defendants' actions were palpably unreasonable.
Affirmed.
KESTIN, P.J.A.D., dissenting.
It does not follow from the majority's admirably comprehensive analysis of the legal standards implicated in this appeal, that plaintiffs must suffer a dismissal at the summary judgment stage. Whether or not the road crew acted reasonably in impinging on a lane of travel in order to perform its maintenance functions is manifestly a question of fact that requires more development than summary judgment procedures typically allow.
It is, for me, especially significant that the Department of Transportation Safety Manual, containing the safety standards which the majority holds to be within the scope of the immunity conferred by N.J.S.A. 59:2-3a, itself provides that those norms "are minimal desirable standards for normal situations and that additional protection should be considered when special complexities and hazards prevail," and that "[i]n particular situations not adequately covered ..., the protection of the traveling public and of the workmen on the scene will dictate the measures to be taken, consistent with the general principles set forth." Clearly, the manual, by its own terms, contemplates that those who make on-the-spot decisions for maintenance crews are not to function as automatons, but are expected to apply good judgment; and that a failure to act reasonably in the circumstances to protect the traveling public may be seen to be actionably flawed conduct.
In order to reach the conclusion that plaintiffs are entitled to a more thorough evaluation of the facts than is permitted on summary judgment, we need not even address, at this time, the questions of how the "palpably unreasonable" standard that *973 pertains to the safety manual applies, or whether it is portable for application to the conduct of the maintenance crew. We need only recognize that the fact issues arising from the judgmental exercise at issue cannot be adequately assessed on summary judgment. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995). At the very least, plaintiffs are entitled to a determination after a plenary-proof opportunity whether the maintenance crew acted in conformity with the safety manual's requirements or good reason. The proofs will need to encompass the perspectives of both sides, including a fair consideration of the public needs that existed, the circumstances that were presented, the range of choices available, and normal practices. Only after such a plenary-proof opportunity can a court define the appropriate measure of reasonableness to be applied in the circumstances established.
This is not to say that the matter must necessarily end with a fact-finder's determination. Defendants will have another opportunity to seek dismissal at the close of plaintiffs' case if the plenary-proof showings made do not establish, sufficiently to command a fact-finder's review, the degree of fault or type of conduct, seen then in the context of full factual development, that satisfies statutory and common law criteria. My only point is that, given the complexity and interplay of the factual and legal elements of the claim, disposition via summary judgment is distinctly premature.
The terms of N.J.S.A. 59:4-2a, generally establishing the parameters of liability, and the well-established idea that even the question of whether conduct was "palpably unreasonable" is ordinarily a jury question, see, e.g., Black v. Borough of Atlantic Highlands, 263 N.J.Super. 445, 451-52, 623 A.2d 257 (App.Div.1993), should preclude a holding in the present posture of the case that relies solely upon the discretionary act immunity for public entities recognized by the Tort Claims Act. Given the patent danger created by the maintenance procedures that were used, plaintiffs' claims are entitled to a fuller evaluation than they have received. Whether those charged with implementing the discretionary standards established in the safety manual made choices that qualify for immunity cannot be determined without further development of the facts.
Where the underlying circumstances are established, but the reasonableness of the parties' conduct in those circumstances remains to be assessed, it is the function of the ultimate fact-finder to "make that call." See Norman v. Selective Ins. Co., 249 N.J.Super. 104, 111, 592 A.2d 24 (App.Div. 1991). As tempting as it may be for a judge on a motion for summary judgmentor an appellate court on reviewto resolve the issue and the dispute by making the critical determination, it is beyond the court's assigned role to do so at the summary judgment stage. This fundamental dynamic of summary judgment jurisprudence was enunciated in Judson v. Peoples Bank & Trust Co., 17 N.J. 67, 110 A.2d 24 (1954), and has been a root-canon of civil procedure in this State and elsewhere for many years. Nothing in Brill, supra, changed the essential principle. See Scheckel v. State Farm Mut. Auto. Ins. Co., 316 N.J.Super. 326, 333-34, 720 A.2d 396 (App.Div.1998).