SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**In the Matter of P.T. Jibsail Family Limited Partnership** (A-35-24) (089547)

**Argued October 21, 2025 -- Decided March 18, 2026**

**JUSTICE WAINER APTER, writing for a unanimous Court.**

In this appeal, the Court considers whether, under the Tidelands Act, the Tidelands Resource Council (TRC) must establish pierhead lines around all New Jersey islands prospectively, or whether the Council can set or modify a pierhead line in the context of reviewing an application for a tidelands license.

Respondent P.T. Jibsail Family Limited Partnership (Jibsail) owns a waterfront property on West Point Island. Petitioner Janine Morris Trust (JMT), owns waterfront property adjacent to Jibsail's. In 2017, Jibsail received a permit from the Department of Environmental Protection (DEP) to build a dock extension and a ten-year tidelands license from the TRC. After the extension was built and found to be 1.7 feet south of the permitted location, Jibsail applied for a modified permit for the as-built dock, which was approved. In April 2019, Jibsail applied to the TRC for a modified tidelands license for the as-built dock extension.

JMT opposed Jibsail's application, claiming the extension created navigational hazards and impacted JMT's rights to use its own dock. At a public hearing, Jibsail explained that the extension was required by DEP subaquatic vegetation habitat rules and by licenses previously granted to neighboring properties to construct similar length docks. The TRC postponed its decision. In September 2022, the TRC approved the modified license. JMT appealed, contesting the TRC's approval of the 2017 and 2022 tidelands licenses. The Appellate Division affirmed, finding the TRC's decision was not arbitrary, capricious, or unreasonable. JMT petitioned for certification, arguing that Section 19 of the Tidelands Act requires the TRC to establish pierhead lines around islands prospectively on a "global and uniform basis." The Court granted certification. 260 N.J. 91 (2025).

**HELD:** The TRC did not exceed its statutory authority in granting Jibsail's 2017 or 2022 tidelands licenses because the plain language of the Tidelands Act authorizes the TRC to set or modify a pierhead line in the context of reviewing an application for a specific tidelands license, rather than requiring the TRC to establish pierhead lines around all New Jersey islands uniformly in advance.

1

1.  The Tidelands Act governs the use of the State's tidelands and creates the TRC as "the public body responsible for the stewardship" of tidelands, or riparian lands. N.J.S.A. 12:3-12.1. It is the responsibility of the TRC "to determine whether applications for the lease, license, or grant of riparian lands are in the public interest" and, if so, to "obtain the fair market value for the lease, license or grant." Ibid. N.J.S.A. 12:3-19 and -20 together govern the TRC's management of tidelands surrounding islands. Both were enacted on February 10, 1891. (pp. 12-15)

2.  N.J.S.A. 12:3-19 currently provides that the TRC "shall, from time to time, fix and establish, around or in front of all islands, reefs and shoals situate in the tidal waters of this State, exterior lines . . . beyond which no pier . . . of any kind shall be made or maintained." "From time to time" means "once in a while"; "occasionally." Thus, rather than requiring the TRC to map pierhead lines around all islands "in the tidal waters of this State" immediately upon enactment, or by some date certain thereafter, the Legislature chose to allow the TRC to "fix and establish" pierhead lines "once in a while," "occasionally," or "now and then," as the TRC saw fit. And rather than requiring the TRC to set pierhead lines all the way "around" each island in the State, the Legislature chose to permit the TRC to fix pierhead lines "around or in front of all islands." The plain text of Section 19 thus does not mandate that the TRC establish one uniform pierhead line around each island; instead, the TRC can establish separate pierhead lines "in front of" separate parts of an island -- i.e., it can "fix and establish" a pierhead line in front of an individual property owner's land. The requirement at the end of Section 19 to file a map showing the lines "so fixed and established" is most naturally read to apply only to pierhead lines placed in front of a riparian grant that existed before February 10, 1891. (pp. 15-19)

3.  The Court's interpretation is consistent with TRC practice since 1891. For almost 70 years, the TRC has relied on a series of decisions for support that it may establish or modify pierhead lines when reviewing an application for a specific license. The Court explains why JMT is mistaken that one of those decisions, Schultz v. Wilson, 44 N.J. Super. 591 (App. Div. 1957), is no longer good law. Over the past 135 years, the TRC has never undertaken to map comprehensive pierhead lines around all islands in the State. If the Legislature believed that was in violation of the Tidelands Act, it likely would have said so. The Court explains why reading Section 19 to permit the TRC to fix or modify a pierhead line in front of part of an island in the context of a particular license does not render "entire sections" of the Tidelands Act inoperative. (pp. 19-24)

      **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.**

SUPREME COURT OF NEW JERSEY

A-35 September Term 2024

089547

In the Matter of P.T. Jibsail
Family Limited Partnership
Tidelands License Number
1515-06-0012.1 TDI 190001.

On certification to the Superior Court,
Appellate Division.

Argued
October 21, 2025

Decided
March 18, 2026

Michael G. Sinkevich, Jr. argued the cause for appellant
Janine Morris Trust (Lieberman Blecher & Sinkevich,
and Mylod & Fitzgerald, attorneys; Michael G.
Sinkevich, Jr., of counsel and on the briefs, and C.
Michael Gan and Philip G. Mylod, on the briefs).

Amie C. Kalac argued the cause for respondent P.T.
Jibsail Family Limited Partnership (Cullen and Dykman,
attorneys; Amie C. Kalac and Neil Yoskin, of counsel
and on the briefs).

Mark Collier, Deputy Attorney General, argued the cause
for respondent New Jersey Department of Environmental
Protection (Matthew J. Platkin, Attorney General,
attorney; Sookie Bae-Park, Assistant Attorney General,
of counsel, and Mark Collier, W. Conor Kennedy, and
Jonathan Allen, Deputy Attorneys General, on the briefs).

Michele R. Donato submitted a brief on behalf of amicus
curiae Save Barnegat Bay (Michele R. Donato, on the
brief).

1

JUSTICE WAINER APTER delivered the opinion of the Court.

This case requires us to determine whether the Tidelands Resource Council must establish pierhead lines around all New Jersey islands prospectively, or whether the Council can set or modify a pierhead line in the context of reviewing an application for a tidelands license.

Tidelands are lands that are covered by water at mean high tide. See O'Neill v. State Highway Dep't, 50 N.J. 307, 323-24 (1967). New Jersey owns all tidelands up to three geographical miles off the coast. See 43 U.S.C §§ 1301(a), 1311(a). The Tidelands Act authorizes the Tidelands Resource Council (TRC) to grant a license, in exchange for a fee, to an individual who wants to construct a dock on tidelands. N.J.S.A. 12:3-10, -12. It also authorizes the TRC to "fix and establish" pierhead lines -- the line "beyond which no pier, wharf, bulkhead, erection or permanent obstruction of any kind shall be made or maintained" -- "around or in front of all islands" "from time to time." Id. at -19.

We hold that the plain language of the Tidelands Act permits the TRC to establish or modify a pierhead line in front of an island in connection with an individual license application. We therefore affirm the Appellate Division's decision.

# I.

## A.

Respondent P.T. Jibsail Family Limited Partnership (Jibsail) owns 83 Pershing Boulevard, a waterfront property on West Point Island. After obtaining a waterfront development permit from the Department of Environmental Protection (DEP) and a seven-year tidelands license from the TRC, Jibsail's predecessor constructed a 128-foot-long dock in Barnegat Bay. Jibsail purchased the property in 2012 and was assigned the tidelands license. Jibsail then applied for, and the TRC granted, a renewed ten-year license.

In March 2017, Jibsail applied to the DEP for a waterfront development permit and to the TRC for a modified tidelands license to build a 185-foot-long dock extension off the end of its existing dock. Jibsail sent written notice of the application and proposed construction to all neighbors within 200 feet, including petitioner Janine Morris Trust (JMT). JMT owns the adjacent waterfront property at 85 Pershing Boulevard, which includes a 100-foot-long dock. After receiving notice, JMT sent an opposition letter to the DEP, arguing that Jibsail's dock extension would endanger boaters and residents.

On May 19, 2017, the DEP approved a waterfront development permit for Jibsail to construct a 167.3-foot-long dock extension, conditioned on Jibsail obtaining a permit from the Army Corps of Engineers and a license

3

from the TRC. The Army Corps issued a permit and the TRC issued a modified revocable tidelands license for use of the 1,596.4 square feet of tidelands required for the proposed dock extension from December 12, 2017, to December 12, 2027.

B.

After Jibsail built the dock extension, the Army Corps determined that it was placed 1.7 feet south of the permitted location, farther from JMT's property. Jibsail therefore applied for a modified waterfront development permit for the as-built dock. Both the DEP and the Army Corps approved modified permits.

In April 2019, Jibsail applied to the TRC for a modified tidelands license for use of the 1,588 square feet of tidelands required for the as-built dock extension. JMT opposed the application and requested an adjudicatory hearing on both the 2017 license and the 2019 proposed modification. The DEP denied the request.

On May 28, 2019, JMT sent letters to the DEP, TRC, and Army Corps, expressing its "severe opposition" to Jibsail's then-completed dock extension. JMT claimed the extension created navigational hazards and impacted its rights to use its own dock. JMT appeared at a TRC hearing on March 4, 2020. John Morris, Janine Morris's husband, testified that Jibsail's dock extension

"compromised greatly" his ability to reach his own dock and created serious navigation hazards. Other members of the public also testified that Jibsail's dock extension negatively impacted the environment, navigation, and safety.

Jibsail explained that the length and shape of the dock extension was required by DEP subaquatic vegetation habitat rules, which required the dock to extend to four feet of water,[1] and by licenses previously granted to 77 and 79 Pershing Boulevard to construct similar length docks. The TRC postponed its decision. Both Jibsail and JMT then submitted legal briefs to the TRC.

On August 23, 2022, JMT filed an Order to Show Cause and Verified Complaint, requesting that the TRC either hold a second hearing or decide Jibsail's modified license application. On September 14, 2022, the TRC held a second public hearing and unanimously approved Jibsail's modified license.

The TRC adopted a resolution memorializing the approval, finding that:

> 1. The Council has determined that the established pierhead line is the outshore extent of an individual riparian owner's riparian rights to erect a dock or pier, or to claim preemptive rights related to a pending application before the Council.

---

[1] In areas with subaquatic vegetation, N.J.A.C. 7:7-9.6(b) allows the "[c]onstruction of a single noncommercial dock or pier provided that . . . [a] minimum water depth of four feet at mean low water must be present in the area where the boats will be moored," and "[t]he extension of existing piers or floating docks through submerged vegetation habitat to water at least four feet deep at mean low water."

2. The Council has determined that the Jibsail Modified Tidelands License does not intersect at or inshore of the established pierhead line of any other licensee or grantee in the area.

3. The Council has determined that the Jibsail Modified Tidelands License does not intersect at or inshore of any point within [JMT's] established pierhead line.

4. The Council has confirmed that the Jibsail Modified Tidelands License had an approved Waterfront Development Permit ("WFD Permit") and an accompanying approved licensed professional survey.

5. In light of the WFD permit issued to Jibsail, the Council has determined that sufficient space was afforded to both the applicant and all permitted and licensed structures in the immediate area.

6. In light of the WFD permit issued to Jibsail, and the comments by the applicant and objector, the Council has determined that sufficient means of navigation was evidenced for both the applicant and the permitted and licensed structures in the immediate area.

7. The Council has determined, in the public interest, that a revocable license, which does not impact the State's title, is the appropriate instrument for the Jibsail Modified License.

8. The Council has given due regard to the interests of navigation for both the applicant and other permitted and licensed structures in the area.

9. The Council acknowledges that the conditions of the Modified Jibsail Dock Extension were impacted by several factors:  the presence of subaquatic vegetation . . . which required Jibsail and other

applicants for new licenses in the area to construct longer docks in order to avoid disturbing that protected habitat; the bending shoreline along Pershing Boulevard which limits the apportionable outshore space to construct a dock; and the WFD Permits and Tidelands Licenses associated with 77 and 79 Pershing Boulevard, which were approved prior to the Jibsail WFD Permit and Tidelands License applications, were of similar lengths and angular configurations, and which significantly limited apportionable outshore space for the Jibsail dock.

The DEP approved the TRC's decision.

## C.

JMT appealed, contesting the TRC's approval of Jibsail's 2017 and 2022 tidelands licenses. The Appellate Division affirmed, finding the TRC's decision was not arbitrary, capricious, or unreasonable. The court emphasized that the TRC not only considered prior approvals by the DEP and Army Corps but conducted its own "careful review" of "extensive testimony, documents, photographs, and arguments," before concluding that "JMT's concerns over the ability to safely navigate to and from its dock were without merit."

The court also held that Jibsail's dock did not interfere with JMT's rights in any way. It distinguished between tidelands grants and tidelands licenses: whereas a grant gives fee simple ownership that "generally extends the full width . . . of the adjacent upland parcel . . . out to the pierhead line," a license gives "the right to use only the area of tidelands circumscribed by a

7

'license box' on the accompanying survey, an outline that closely approximates the size of the permitted structure -- in this case, a dock." Here, although "JMT is the fee simple owner of . . . the upland area," it could not simply "extend[] waterward" "its upland property lines" to claim ownership over the tidelands. Instead, JMT was only a "licensee of the tidelands within the license box drawn around its [own] dock," and its right to use tidelands outside of that license box was "no stronger . . . than the riparian right of any other member of the public." Because "Jibsail's dock d[id] not intersect with JMT's licensed area" in any way, JMT's rights did not "prevent the State from claiming title to and managing the tidelands outside of JMT's licensed area."

Relying on Section 19 of the Tidelands Act, N.J.S.A. 12:3-19, and Schultz v. Wilson, 44 N.J. Super. 591, 607 (App. Div. 1957), the Appellate Division rejected JMT's argument that the TRC is statutorily prohibited from establishing or modifying pierhead lines through individual licenses.

### D.

We granted JMT's petition for certification. 260 N.J. 91 (2025). We also granted leave to appear as amicus curiae to Save Barnegat Bay.

### II.

JMT argues that the TRC exceeded its statutory authority in approving Jibsail's 2017 and 2022 licenses. According to JMT, the TRC had previously

established a pierhead line around West Point Island, as evidenced by a 1994 Borough of Lavallette Tax Map.  JMT claims that Jibsail's dock extension goes far beyond that line, and the TRC is statutorily prohibited from modifying pierhead lines through an individual license.  Section 19 of the Tidelands Act, JMT contends, requires the TRC to establish pierhead lines around islands prospectively on a "global and uniform basis" and to file "a statewide survey and map delineating the pierhead line" so established with the Secretary of State.  Section 19 also bars the TRC from amending pierhead lines "on an ad hoc basis through individual conveyances," JMT maintains.  If "the TRC could simply amend these lines on an application-by-application basis," JMT asserts, "there would be no point in establishing a . . . pierhead line in advance," and "entire sections" of the Tidelands Act would be rendered "'inoperative, superfluous, [and] void.'"  (quoting Sanchez v. Fitness Factory Edgewater, LLC, 242 N.J. 252, 261 (2020), and citing N.J.S.A. 12:3-3, -14, -20, and -23).

Amicus Save Barnegat Bay similarly argues that the TRC's grant of a tidelands license "without the advance establishment of" a pierhead line that is "comprehensive" and "surveyed" violates the Tidelands Act and is dangerous to Barnegat Bay's ecosystem, navigation, and recreation.  According to amicus, N.J.S.A. 12:3-19 and -20 "unambiguously require the TRC to establish

9

in advance pierhead lines" and prohibit the TRC from "draw[ing] lines improvisationally as each tidelands' application is received."

The DEP contends that the plain text of N.J.S.A. 12:3-19 authorizes the TRC to draw pierhead lines "from time to time" and "for an area less than around" an entire island -- thus permitting the TRC to modify or establish a pierhead line in connection with an individual license application. According to the DEP, there is no record that the TRC has ever established a pierhead line around all of West Point Island, and no evidence that the pierhead line shown on the Lavallette Tax Map was set or approved by the TRC. Instead, "with the explicit endorsement of judicial precedent, the TRC has carried on a decades-long practice of establishing [pierhead] lines on a case-by-case basis through individual conveyances." (citing Schultz, 44 N.J. Super. 591). Voiding the TRC's ability to do so, the DEP warns, could threaten more than 100 years of licenses and grants and require the State to "muster a huge amount of resources to survey, study, draw and catalog the [pierhead] lines statewide."

Jibsail similarly maintains that "[p]etitioner's argument that TRC is required to establish uniform, and permanent, pierhead lines in all of the State's tidewaters is contrary to" the Tidelands Act. It also conflicts with the "TRC's established practice," and "would require TRC to revoke thousands of tidelands licenses" for already-constructed docks, Jibsail explains. Like the

10

DEP, Jibsail relies on the phrase "from time to time" in N.J.S.A. 12:3-19.

Jibsail also argues that "[l]ines included on a tax map that have not been

approved by NJDEP have no weight and do not limit the statutory authority"

of the TRC to modify pierhead lines through individual licenses.

III.

A.

The TRC, which falls within the DEP, is charged with enforcing the

Tidelands Act.  N.J.S.A. 12:3-12.1; N.J.S.A. 13:1B-13.  The Appellate

Division quoted Utley v. Board of Review, Department of Labor for the

proposition that we must give "some deference" to an agency's "interpretation

of statutes . . . within its implementing and enforcing responsibility."  194 N.J.

534, 551 (2008) (quotation omitted).  However, we have not always been

consistent about what standard of review applies to an agency's interpretation

of a statute it is charged with enforcing.[2]  In addition, the United States

---

[2] At times, we have stated that "[w]e will defer to an agency's interpretation of . . . a statute . . . within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable'" because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise."  See, e.g., In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010).  In other cases, we have reviewed an agency's interpretation of a statute it is charged with enforcing de novo.  See, e.g., Musker v. Suuchi, Inc., 260 N.J. 178, 185-89 (2025).  And in other cases, we have stated that we will give "great deference to an agency's interpretation of statutes within its scope of authority," but are not "bound by an agency's determination on a question

11

Supreme Court recently held that federal courts "may not defer" to a federal agency's interpretation of a statute it is charged with enforcing, even if the statute is ambiguous. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 413 (2024). We do not attempt to reconcile our conflicting case law, or grapple with the reasoning of Loper Bright, because our decision in this case would be the same regardless of whether we deferred to the DEP's interpretation of the Tidelands Act or reviewed the statute de novo.

B.

The State generally owns in fee simple all tidelands, or lands that are or were "flowed by the tide up to the high-water line." O'Neill, 50 N.J. at 323-24. "[T]he owner of oceanfront property" on the other hand, "holds title to the property upland of the high water mark." City of Long Branch v. Jui Yung Liu, 203 N.J. 464, 475 (2010).

The Tidelands Act, which dates back to 1864, governs the use of the State's tidelands. See L. 1864, c. 391; N.J.S.A. 12:3-1 to -71. The Act creates the TRC as "the public body responsible for the stewardship" of tidelands, which are also known as riparian lands. N.J.S.A. 12:3-12.1. "Any riparian

---

of law" and "therefore apply de novo review to issues of statutory interpretation." See, e.g., Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 485, 489 (2019).

owner on tidewaters in this State who is desirous to obtain a lease, grant or conveyance from the State of New Jersey of any lands under water in front of his lands" may apply to the TRC, which may "make such lease, grant or conveyance with due regard to the interests of navigation," in exchange for "such compensation . . . to the State of New Jersey" as the TRC shall determine. Id. at -10. Specifically, the Act authorizes the TRC to grant or lease tidelands "lying between what was, at any time heretofore, the original high-water line and the seaward territorial jurisdiction of the State," i.e., up to three miles offshore, "in all cases in which, in their discretion, [the TRC] shall think such grant or lease should be made." Id. at -12.

It is the responsibility of the TRC "to determine whether applications for the lease, license, or grant of riparian lands are in the public interest" and, if so, to "obtain the fair market value for the lease, license or grant." Id. at -12.1. Any lease or grant must be approved by the TRC, the DEP Commissioner, and the Attorney General. N.J.S.A. 13:1B-13.

In order to build or alter a dock, a waterfront property owner needs both a waterfront development permit and a tidelands license for a particular square footage of tidelands underneath and surrounding the proposed dock. See N.J.S.A. 12:5-3(a); Peter J. Gannon, Riparian Rights 9 (1955); In re Tideland's License 96-0114-T, 326 N.J. Super. 209, 211 (App. Div. 1999) (explaining that

13

the challenged tidelands license was issued "to permit the 'use and maintenance of a pier'").

The Tidelands Act contains two provisions that together govern the TRC's management of tidelands surrounding islands. See N.J.S.A. 12:3-19, -20. Both were enacted on February 10, 1891, L. 1891, c. 5, and amended in 2009, L. 2009, c. 40. Section 19 currently states:

> The Tidelands Resource Council, with the approval of the Commissioner of Environmental Protection and after consultation with the Army Corps of Engineers, shall, from time to time, fix and establish, around or in front of all islands, reefs and shoals situate in the tidal waters of this State, exterior lines in said waters, beyond which no pier, wharf, bulkhead, erection or permanent obstruction of any kind shall be made or maintained, and also the interior lines for solid filling in said waters, beyond which no permanent obstruction shall be made or maintained other than wharves and piers and erections thereon for commercial uses; provided, however, that no exterior line around or in front of any such island, reef or shoal shall be fixed and established in front of any riparian grant which was made prior to February tenth, one thousand eight hundred and ninety-one, unless such exterior line shall be fixed and established, after consultation with the Army Corps of Engineers, at such distance as will, in the judgment of the Tidelands Resource Council, leave sufficient waterway in front of said grants for navigation, and when the council shall have so fixed and established said lines after consultation as aforesaid, it shall file a survey and map thereof in the Office of the Secretary of State, showing the lines for piers and solid filling so fixed and established.

14

[N.J.S.A. 12:3-19 (the shown emphasis was included in L. 1891, c. 5, § 1).]

Section 20 provides:

> The Tidelands Resource Council, together with the Commissioner of Environmental Protection, may sell or let to any applicant therefor any of the lands under water and below mean high-water mark, embraced within the lines fixed and established pursuant to [N.J.S.A.] 12:3-19 upon such terms as to purchase money or rental, and under such conditions and restrictions as to time and manner of payment, the duration and renewal of any lease, the occupation and use of the land sold or leased, and such other conditions and restrictions as the interest of the State may require, and as may be fixed and determined by the council together with the commissioner.

[N.J.S.A. 12:3-20.]

## IV.

We hold that the TRC did not exceed its statutory authority in granting Jibsail's 2017 or 2022 tidelands licenses because the Tidelands Act authorizes the TRC to set or modify a pierhead line in the context of reviewing an application for a specific tidelands license, rather than requiring the TRC to establish pierhead lines around all New Jersey islands uniformly in advance.

In interpreting the Tidelands Act, "[w]e ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted). In so doing, we "strive for

15

an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void or insignificant." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 172 (1999).

We focus first on the requirement that the TRC "shall, from time to time, fix and establish, around or in front of all islands, reefs and shoals situate in the tidal waters of this State, exterior lines in said waters, beyond which no pier . . . of any kind shall be made or maintained." N.J.S.A. 12:3-19 (emphases added). We refer to such exterior lines as pierhead lines.

"From time to time" means "once in a while" or "occasionally." Merriam-Webster's Collegiate Dictionary 1309 (11th ed. 2003); see also New Oxford American Dictionary 697 (3d ed. 2010) (defining "from time to time" as "occasionally"); Cambridge Academic Content Dictionary 381 (1st ed. 2008) (defining "from time to time" as "sometimes, but not regularly"). That definition has apparently been consistent since 1891. See, e.g., Upshur v. Mayor of Balt., 51 A. 953, 955 (Md. 1902) ("The Century Dictionary defines . . . the phrase 'from time to time' to mean 'occasionally;' and the Universal Dictionary defines 'from time to time' to mean 'at intervals; now and then.'"); Florey v. Meeker, 240 P.2d 1177, 1190 (Or. 1952).

Thus, rather than requiring the TRC to map pierhead lines around all islands "situate[d] in the tidal waters of this State" immediately upon

16

enactment in 1891, or by some date certain thereafter, the Legislature chose to allow the TRC to "fix and establish" pierhead lines "once in a while," "occasionally," or "now and then," as the TRC saw fit.

And rather than requiring the TRC to set pierhead lines all the way "around" each island in the State, the Legislature chose to permit the TRC to fix and establish pierhead lines "around or in front of all islands."  The plain text of Section 19 thus does not mandate that the TRC establish one uniform pierhead line around each island; instead, the TRC can establish separate pierhead lines "in front of" separate parts of an island.  In other words, the TRC can "fix and establish" a pierhead line in front of an individual property owner's land.

In asserting that the TRC must uniformly establish pierhead lines around all islands in the state prospectively, JMT relies heavily on the last words of Section 19, which it maintains require the TRC to file a survey and map with the Secretary of State of all pierhead lines "so fixed and established."  But the language JMT homes in on is contained in the second clause of Section 19, which is separated from the first clause of Section 19 by a semicolon and the originally italicized words "provided, however."

"A semicolon in an antecedent phrase is commonly interpreted to separate that phrase from a subsequent modifying phrase."  Morella v. Grand

Union/N.J. Self-Insurers Guar. Ass'n, 391 N.J. Super. 231, 241 (App. Div. 2007), aff'd o.b., 193 N.J. 350 (2008); accord Robinson v. Zorn, 430 N.J. Super. 312, 319 (App. Div. 2013).  And the phrase "provided, however" introduces a separate proviso, not a continuation of an earlier clause.  See Andrito v. Allstate Ins. Co., 161 N.J. Super. 409, 413 (Law Div. 1978) ("'provided, however, that,' are words of art signifying a proviso" (citing Black's Law Dictionary 1388 (4th ed. 1968) (defining "provided" as "[t]he word used in introducing a proviso"))).  A proviso is "a provision that begins with the words provided that and supplies a condition, exception, or addition." Black's Law Dictionary 1481 (11th ed. 2019).

Here, the proviso that follows the semicolon in Section 19 appears to lay out an exception to the general rule:  the TRC cannot place a pierhead line in front of any riparian grant made before February 10, 1891, unless it first consults with the Army Corps and determines that the pierhead line "leave[s] sufficient waterway in front of said grant[] for navigation."  N.J.S.A. 12:3-19. Then, separated only by a comma, the proviso continues:  "and when the [TRC] shall have so fixed and established said lines after consultation as aforesaid, it shall file a survey and map thereof in the Office of the Secretary of State, showing the lines."  Ibid.

18

The requirement to file a survey and map in the Office of the Secretary of State is therefore most naturally read to apply only when a pierhead line is placed in front of a riparian grant that existed before February 10, 1891. All agree there is no pre-1891 riparian grant at issue in this case.

That interpretation is consistent with TRC practice since 1891. There is no record that the TRC has ever established a pierhead line around the entirety of West Point Island, and no evidence that the pierhead line shown on the Borough of Lavallette Tax Map was ever set or approved by the TRC. The DEP confirmed at oral argument that the TRC does not set pierhead lines around islands in the State prospectively and does not file maps or surveys of such pierhead lines with the Secretary of State. Counsel for JMT conceded that it could find no maps or surveys of pierhead lines on file with the Secretary of State.

Instead, for almost seventy years the TRC has relied on Bailey v. Driscoll (Bailey I), 19 N.J. 363, 367 (1955); Bailey v. Council, Division of Planning & Development, 22 N.J. 366, 372 (1956); and Schultz, 44 N.J. Super. at 607, to support its position that the Tidelands Act authorizes the TRC to establish or modify pierhead lines when reviewing an application for a specific tidelands license.

In Schultz, the pierhead line "had not theretofore been established with respect to the entire length of" the relevant tidelands, and the TRC instead "expressly fixe[d]" the exterior line in the deed that recorded the challenged riparian grant. 44 N.J. Super. at 606. The Appellate Division rejected the challenge, holding that the pierhead line "was fixed in accordance with express statutory authority, [N.J.S.A.] 12:3-17, and the established practice of the [TRC] in fixing exterior lines in riparian deeds and the accompanying maps." Ibid. The court further held that Bailey I did not require "that the pierhead and bulkhead line must have been established prior to the making of a particular grant." Ibid.

JMT argues that Schultz is no longer good law because the statutory section it cited, N.J.S.A. 12:3-17, has since been repealed. It is true that Section 17 was repealed in 1979. But Section 17 never expressly approved of the TRC setting pierhead lines in an individual grant or license. It allowed upland owners to request surveys and maps of the tidelands adjoining their property, and the State to charge owners for such maps.[3] Its repeal does not undermine Schultz's holding.

---

[3]    L. 1875, c. 308, codified at Section 17, originally read:

> Whereas, applications are frequently made to the riparian commissioners for grants of lands under tidewater in various parts of the state, requiring surveys

20

And it does not change the fact that over the past 135 years, the TRC has never undertaken to map comprehensive pierhead lines around all islands in the State. If the Legislature believed that was in violation of the Tidelands

to be made and maps to be prepared and filed with the secretary of state, and some provision should be made to have these surveys extended from time to time as the citizens of the state may require, and in order to provide the necessary means for carrying on this work without any additional tax on the treasury of the state, therefore

Be it enacted by the Senate and General Assembly of the State of New Jersey,

That the riparian commissioners may and shall at the request of shore owners extend their surveys over the tide-waters of this state, and prepare maps and have the same filed as now provided by the act to which this is a supplement and the supplements thereto, and to provide the necessary means to pay the expenses incurred by them in this work without charge to the treasury; they may retain and expend for this purpose not to exceed in the aggregate five per centum of the amounts named in the grants or leases made to riparian owners . . . .

Immediately before it was repealed, Section 17 read:

The board shall, at the request of shore owners, extend its surveys over the tidewaters of this state and prepare and file maps thereof in the office of the secretary of state showing what lines have been fixed and established for the exterior lines for solid filing and pier lines.

[N.J.S.A. 12:3-17 (1979) (repealed eff. Jan. 17, 1980 by L. 1979, c. 311, § 4).]

Act, it likely would have said so.  Cf. GE Solid State, Inc. v. Dir., Div. of Tax'n, 132 N.J. 298, 313 (1993) ("[C]ourts have acknowledged that the practical administrative construction of a statute over a period of years without legislative interference will, under appropriate circumstances, be accorded great weight as evidence of its conformity with legislative intent.").

Finally, contrary to JMT's contention, our interpretation of Section 19 as permitting the TRC to fix or modify a pierhead line in front of part of an island in the context of approving a particular license does not render "entire sections" of the Tidelands Act inoperative.  JMT cites Sections 3, 14, 20, and 23.  We address each in turn.

Section 3 is not relevant to this case.  It concerns pierhead lines drawn and piers erected on the Hudson River, New York Bay and Kill von Kull, and specifies permitted intervals between piers (75 feet), how piers shall be constructed (on piles or on blocks and bridges), and how water must be permitted to pass under a pier.  N.J.S.A. 12:3-3.

Section 14 applies to lines set pursuant to Section 13.  N.J.S.A. 12:3-13 authorizes the TRC to "change, fix and establish any other lines than those now fixed and established for pier lines, . . . and when so fixed and established, the council shall file a map and surveys in the office of the secretary of state, showing what lines have been fixed and established by it for

22

. . . pier lines." N.J.S.A. 12:3-14 then provides: "From and after the filing of said map and surveys in the office of the secretary of state, no encroachment of any kind shall be permitted to be made beyond said lines so fixed and established for . . . pier lines . . . ." Neither provision applies to islands, and neither says anything about the TRC's authority to set pierhead lines around or in front of islands. Our decision has no impact on either.

Section 20 is quoted in full above on page ___ (slip op. at 15). Nothing in Section 20 states or implies that pierhead lines must be set prospectively for all islands in the State or may not be "fixed and established" when the TRC reviews a license application.

Section 23 permits the TRC to "lease or grant the lands of the State below mean high-water mark and immediately adjoining the shore" to an applicant who is not the owner of the shore property only if the shore owner "shall have received six months' previous notice of the intention to take said lease" and "shall have failed or neglected within said period of six months to apply for and complete such lease or grant." N.J.S.A. 12:3-23. Section 23 says nothing about the TRC's authority to set or establish pierhead lines. And all agree that it does not apply in this case, as Jibsail's dock extends directly from its own shoreline, not JMT's.

23

V.

For the reasons stated, we affirm the Appellate Division's judgment.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, NORIEGA, and HOFFMAN join in JUSTICE WAINER APTER's opinion.

24